1   DANIEL G. BOGDEN
    United States Attorney
2
    GREG ADDINGTON
3   Nevada State Bar No. 6875
    Assistant United States Attorney
4   100 West Liberty Street, Suite 600
    Reno, Nevada  89501
5   Telephone:  (775) 784-5438
    Facsimile:  (775) 784-5181
6

7                   UNITED STATES DISTRICT COURT

8                        DISTRICT OF NEVADA

9   UNITED STATES OF AMERICA,              Case No. 3:13-cv-00324-LRH-VPC

10                    Plaintiff,            UNITED STATES' MOTION FOR
                                            SUMMARY JUDGMENT
11          v.

12  $167,070.00 IN UNITED STATES
    CURRENCY,
13

14                    Defendant.

15  STRAUGHN SAMUEL GORMAN,

16                    Claimant.

17

18          Comes now plaintiff United States of America, through its undersigned counsel, and moves

19  this Court for an Order granting summary judgment in favor of the United States in this action. This

20  motion is brought pursuant to Rule 56, Fed.R.Civ.P., and is made on the grounds that the defendant

21  currency, totaling $167,070.00, is subject to forfeiture to the United States pursuant to 21 USC

22  §  881(a)(6) notwithstanding the contrary claims of claimant Straughn Samuel Gorman.

23          This motion is based on the pleadings and papers filed in this action, the declaration of Elko

24  County Deputy Sheriff Doug Fisher, the discovery materials attached to the declaration of Greg

                                            1

Addington, and the accompanying memorandum of law.  Based on the applicable legal standard and the facts established through the referenced declaration of Elko County Deputy Sheriff Fisher and through formal discovery, summary judgment of forfeiture should be entered in favor of the United States and against the defendant currency.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney


 /s/ Greg Addington
GREG ADDINGTON
Assistant United States Attorney


MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMAMRY JUDGMENT

I. INTRODUCTION

This is a civil forfeiture action against a quantity of U.S. currency ($167,070.00) which was seized in January 2013 from Straughn Samuel Gorman ("Gorman") following a traffic stop initiated by an officer of the Elko County Sheriff's Office (ECSO).  The civil forfeiture complaint (#1) was filed in June 2013. The verified complaint describes the circumstances of the January 2013 traffic stop by ECSO and the subsequent discovery of the defendant currency throughout the motorhome Gorman was driving. Specifically, the complaint describes the positive alert by a qualified drug-detection canine to the motorhome and the subsequent discovery of the bundled and packaged currency in various locations throughout the motorhome along with other materials commonly associated with drug trafficking.

As expected, one person (Gorman) filed a claim (#7) of ownership regarding the defendant currency and thereafter filed an answer (#9) to the complaint.  The declaration of ECSO Deputy Fisher together with Gorman's responses to formal discovery (interrogatories and document production requests) support entry of summary judgment at this time. Rather than provide information and documents requested through the United States' discovery efforts, Gorman invoked his Fifth

Amendment privilege against self-incrimination in response to all discovery requests other than bland biographical information about himself (e.g., name, address, marital status, etc.) and conclusory statements about his ownership interest in the defendant currency. Specifically, Gorman declined, on Fifth Amendment grounds, to provide *any* information or documentation about how he acquired ownership or possession of the defendant currency, his employment history, the purpose of his cross-country trip in a motorhome which did not belong to him, whether the defendant currency represented income earned by him from any source, whether the defendant currency had been withdrawn from a bank or other financial institution, his criminal history, whether the defendant currency had been inherited by him or gifted to him, and whether he has filed federal income tax returns for the five years prior to the currency seizure.

Gorman's election to not participate in the discovery process yields two consequences. First, an adverse inference is appropriately drawn from his invocation of the Fifth Amendment. Second, Gorman is now precluded from presenting any evidence to rebut the government's factual presentation under Rule 56, Fed.R.Civ.P. Given the state of the evidence, summary judgment should now be entered in favor of the United States because the aggregate facts – taken as a whole – satisfy the United States' burden of proof in this case and those facts cannot be rebutted by Gorman.

II. STATEMENT OF FACTS [1]

1.    On January 23, 2013, ECSO Deputy Doug Fisher was monitoring west-bound traffic on Interstate 80 near Elko, Nevada. At approximately 10:20 am, he observed a white motorhome bearing Delaware license plates traveling westbound with the driver's side window obstructed by a window curtain which had been pulled forward. Deputy Fisher followed the white motorhome and observed the motorhome drift to the right on to the white fog line three times and remain on the fog line each time for at least 400 yards. Deputy Fisher also observed that the rear window of the motorhome was obstructed by blinds or curtains which were closed. See Fisher Decl., ¶ 3.

---

[1]    The Statement of Facts is supported by the declaration of ECSO Deputy Doug Fisher (#12), filed herewith and the Declaration of Greg Addington (#13). Gorman's discovery responses are attached as exhibits to the Addington declaration.

3

2.      Based on his observations, Deputy Fisher activated the overhead lights on his patrol car in an effort to initiate a stop of the white motorhome.  Deputy Fisher remained behind the white motorhome with his overhead lights activated for approximately one mile with no apparent effect on the driver of the motorhome.  In an effort to make his patrol car more visible to the driver of the motorhome and mindful of the curtain obstructing the driver's side window, Deputy Fisher moved to the left and straddled the center white line with his patrol car and, while keeping the overhead lights activated on his patrol car, followed the white motorhome for an additional mile (approximate) with no apparent effect on the driver of the motorhome.  Deputy Fisher then moved his patrol car closer to the motorhome and activated his siren for two short bursts in an effort to draw the attention of the driver of the motorhome, again with no apparent effect on the driver of the motorhome.  Deputy Fisher then moved his patrol car forward next to the driver's side of the motorhome and again activated his siren for two short bursts in an effort to draw the attention of the driver of the motorhome, whereupon the driver of the motorhome pulled the curtain away from the driver's side window and stopped the motorhome on the right side of the road.  See Fisher Decl., ¶ 4.

3.      After initiating the traffic stop of the white motorhome, Deputy Fisher approached the right side of the motorhome and the driver exited the motorhome through the right-side main door.  The driver was identified as Gorman through his Delaware driver's license.  See Fisher Decl., ¶ 5.

4.      Deputy Fisher advised Gorman of the reason for the traffic stop and further advised Gorman of the safety issue caused by the obstructed side window.  Responding to Deputy Fisher's remarks, Gorman stated that he (Gorman) had been pulled over regarding "the same thing or something like driving on the line" less than one hour earlier.  Gorman also stated that he was traveling to Sacramento to visit his girlfriend and then stated that he was going to move to California.  Responding to Deputy Fisher's enquiry, Gorman stated that he had a paddleboard company and other beach activities in Maui.  See Fisher Decl., ¶ 6.

5.      Deputy Fisher returned to his patrol car and requested a records check based on the identification and vehicle registration documents supplied by Gorman.  While the records check was in progress, Deputy Fisher used a trained drug-detection canine (named "Euros") to perform an exterior canine sniff of the motorhome.  The drug-detection canine ("Euros") positively alerted to the right rear fender and rear cargo area of the motorhome, indicating the presence of the odor of illegal drugs in those areas of the motorhome.  See Fisher Decl., ¶ 7.

6.      The records check which was completed based on the identification and registration documents supplied by Gorman showed that the registered owner of the white motorhome was Kyle William Hopkins.  See Fisher Decl., ¶ 8.

7.      Through January 2013, Deputy Fisher's duties included participation in ECSO's K-9 program and, specifically, responsibility for handling drug-detection canine "Euros" and maintaining the training records for Euros.  From 2012-2013, Deputy Fisher and drug-detection canine "Euros" were certified through the American Society of Canine Trainers as a Law Enforcement K9 Master Trainer in the subject areas of narcotics, patrol, and tracking.  From 2011-2012, Deputy Fisher and Euros were certified through the American Society of Canine Trainers as a Law Enforcement K9 Departmental Trainer in the subject areas of narcotics, patrol, and tracking.  In 2010 and again in 2011, Deputy Fisher and Euros successfully completed 40 hours of canine development training, including advanced narcotics interdiction, K9 problem solving, and tactical dog training and development.  In September 2010, drug-detection canine Euros was certified by the State of Utah, Department of Public Safety, as a Tactical Deployment Dog in accordance with Utah Code Title 53 Chapter 6.  Through 2012, and continuing through January 2013, Euros and Deputy Fisher trained together with weekly training averaging approximately 4 hours per week.  Through 2012, and continuing through January 2013, multiple search warrants were sought and issued in Elko County and Humboldt County based on alerts made by Euros.  Through late 2012, and continuing through January 2013, Euros' accuracy rate

for drug detection was consistent and reliable.  Through late 2012, and continuing through January 2013, continuous training with Euros included:  1) training in different interdiction areas, including industrial buildings, cars, trucks, tractor trailers, residences, and open areas; 2) training on various quantities of controlled substances ranging from grams to pounds; 3) training on blank searches, with no contraband or drugs present; and 4) proof training, which prevents the dog from alerting to items commonly associated with controlled substances such as plastic gloves, human odor, dog odor, and other investigative materials.  See Fisher Decl., ¶ 9.

8.     Deputy Fisher is a law enforcement officer employed by the Elko County Sheriff's Office.  He has been so employed since 2003 and currently holds the rank of Sergeant.  In addition to his category 1 peace officer training, he has completed 92-plus hours of training in highway interdiction, which included training is asset forfeiture, 610-plus hours of K-9 handling, and he has provided 320-plus hours of instruction related to narcotics canine handling.  Deputy Fisher has been involved with and/or initiated 55-plus cases involving high-level drug offenses and has successfully executed multiple search warrants resulting in major drug seizures.  See Fisher Decl., ¶ 1-2.

9.     Based on the totality of the circumstances concerning the traffic stop, Deputy Fisher applied for a search warrant from the Justice Court of Elko Township, Elko County, Nevada.  The application for a search warrant was granted and a search warrant was issued by Elko County Justice of the Peace Brian Boatman at approximately 11:15 am on January 23, 2013, authorizing a search of the white motorhome.  See Fisher Decl., ¶ 10.

10.     The search of the white motorhome was conducted with the assistance of "Euros," a trained drug-detection canine.  During the search of the interior of the white motorhome, Euros positively alerted to Gorman's backpack, clothes, and blankets, and also positively alerted to the overhead storage cabinets above the master bed, indicating the presence of the odor of illegal drugs in those areas of the motorhome.  See Fisher Decl., ¶ 11.

6

11.     The search of the white motorhome yielded the discovery of the defendant currency in multiple locations as follows:

a)      a white envelope containing US currency totaling $3,250 (consisting of 30 $100 bills and 5 $50 bills) and with the word "mine" written on the outside of the envelope was found in a black and gray suitcase;

b)      a bundle of US currency totaling $4,080 (consisting of 1 $100 bill, 5 $50 bills, 186 $20 bills, and 1 $10 bill) bound with rubber bands was found in the exterior pouch of a black and gray backpack next to the master bed;

c)      a bundle of US currency totaling $4,000 (consisting of 8 $100 bills, 26 $50 bills, and 95 $20 bills) bound with rubber bands was found in the exterior pouch of a black and gray backpack next to the master bed;

d)      multiple bundles of US currency, each bound with rubber bands and sealed inside plastic vacuum-sealed bags commonly used for food storage, were found in various locations throughout the white motorhome including in overhead storage cabinets, in the refrigerator, and in the microwave oven, as described below:

i.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $9,900 (consisting of 495 $20 bills) with the dollar amount written with a black marker on the plastic bag;

ii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

iii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

iv.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

7

v.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

vi.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

vii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 20 $100 bills and 400 $20 bills) with the dollar amount written with a black marker on the plastic bag;

viii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

ix.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $13,000 (consisting of 50 $100 bills, 60 $50 bills, and 250 $20 bills) with the dollar amount written with a black marker on the plastic bag;

x.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xi.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $11,960 (consisting of 30 $100 bills, 40 $50 bills, and 348 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $9,920 (consisting of 496 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xiii.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $10,000 (consisting of 500 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xiv.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $1,880 (consisting of 4 $100 bills, 71 $20 bills, and 6 $10 bills) with the dollar amount written with a black marker on the plastic bag;

xv.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $4,000 (consisting of 6 $50 bills, 184 $20 bills, and 2 $10 bills) with the dollar amount written with a black marker on the plastic bag;

xvi.      bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $5,060 (consisting of 253 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xvii.    bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $5,020 (consisting of 251 $20 bills) with the dollar amount written with a black marker on the plastic bag;

xviii.    bundles of US currency, bound with rubber bands and sealed inside a plastic vacuum-sealed bag commonly used for food storage, totaling $5,000 (consisting of 100 $50 bills) with the dollar amount written with a black marker on the plastic bag.

See Fisher Decl., ¶ 12.

12.    The search of the white motorhome yielded the discovery of fifteen pages of papers and notes with entries consistent with "pay/owe" sheets commonly used in illegal drug trafficking enterprises, found in the exterior pocket of a gray and black backpack next to the master bed.  See Fisher Decl., ¶ 13.

13.    The search of the white motorhome yielded the discovery of a Google map printout showing driving directions from Milton, Delaware, to Garberville, California, located in an atlas on the passenger seat of the motorhome.  Garberville, California, is a location in northern California (Humboldt County) renowned for large-scale marijuana cultivation and distribution.  See Fisher Decl., ¶ 14.

14.    The search of the white motorhome yielded the discovery of a prescription-strength inhaler containing Proventil with a prescription label designating "Ryan Cavalear" as the patient, found in the gray and black backpack next to the master bed.  Inhalers of this type are commonly used by chronic marijuana smokers.  See Fisher Decl., ¶ 15.

15.    The search of the white motorhome yielded the discovery of two large empty canvas duffle-type bags and a large empty hard-sided storage "Pelican" case, consistent with materials commonly used in illegal drug trafficking enterprises to transport drugs in bulk quantities.  See Fisher Decl., ¶ 16.

16.    On November 1, 2013, the United States propounded to Gorman a set of interrogatories and a request for production of documents.  After extensions of time were granted for Gorman to

respond to the discovery requests, he provided his "objections and answers" dated January 27, 2014. See Addington Decl., ¶ 2.

17.     Responding to the US interrogatories, Gorman provided biographical information about himself including his name, current address, and Social Security number (interrogatory number 1).[2] He also stated that he has never been married (interrogatory number 4), is the sole owner of all of the currency (interrogatory numbers 5 and 6), and identified Kyle Hopkins (the registered owner of the motorhome) as his brother and Ryan Cavalear (the name of the patient on the inhaler prescription in Gorman's backpack) as his friend (interrogatory number 12 and 13).  See Addington Decl., ¶ 3 and Exhibit A thereto.

18.     Responding to the US interrogatories, Gorman invoked his Fifth Amendment rights as follows in response to specific interrogatories regarding his interest in the defendant currency, his employment and earnings history, his prior residence addresses, the purpose of his January 2013 cross-country trip, and other questions directed to the factual support for his claim in this civil forfeiture proceeding.  Specifically, Gorman responded as set forth below to the following interrogatories:

a.     State all addresses at which you have resided, however temporarily, since 2008 and for each such address state the dates you resided there.  (Interrogatory number 2).
RESPONSE:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

b.     Provide the full names, the dates of birth, and relationship to you of any and all persons who were residing, for any length of time, at the addresses identified in your responses to interrogatory number 1 and 2, above, at the same time you resided at such addresses.  (Interrogatory number 3).
RESPONSE:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

c.     Describe the nature and extent of your interest in the defendant currency, including the amount of the currency you claim and the manner in which you acquired your claimed interest.  (Interrogatory number 5).

---

[2]  Gorman's Social security number is redacted in the exhibit attached to the Addington declaration.

<u>RESPONSE</u>:  I am the owner of the entirety of the defendant currency and I therefore claim the entire amount.  I respectfully decline to answer the rest and remainder of this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

    d.      State the purpose of the trip you were taking at the time of the seizure of the defendant currency including in your answer the following information:  a) the full names and residence addresses of any persons traveling with you on any portion of the trip, b) the nature of your relationship with any persons traveling with you on any portion of the trip, c) the place and date of the start of your travel, and d) the intended itinerary of your travel when you began.  (Interrogatory number 7).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

    e.      State whether you claim that the defendant currency is, in whole or in part, derived from income you have earned from any source and, if so, state the source of income from which you claim the currency was derived.  (Interrogatory number 8).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

    f.      State your current occupation, the name and business address of your current employer, the names and business addresses of your previous employers since 2008 (including the dates of such employment), and your gross and taxable income for federal income tax purposes for the years 2008-2012. (Interrogatory number 9).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

    g.      State whether any portion of the defendant currency was withdrawn by you, or by someone acting on your behalf, from a bank or other financial institution within 180 days prior to the seizure of the defendant currency and, if so, state the following:  a) the name and address of the bank or other financial institution where any such withdrawal was made, b) the names and account numbers of all accounts for which you have signatory authority at such bank or financial institution, c) the dates on which any such withdrawal was made, d) the full names and residence addresses of any persons who accompanied you, assisted you or otherwise participated in any such withdrawal, and e) the amount of each such withdrawal.  (Interrogatory number 10).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

    h.      State whether you have ever been convicted of any criminal offense and, if so, provide the following information:  a) the criminal offense for which you were convicted, b) the date of the conviction, c) the location and jurisdiction of the court in which the conviction was adjudicated, d) the sentence imposed upon such conviction, and e) whether you are currently on parole or under any other court-sanctioned supervision on account of a criminal proceeding.  (Interrogatory number 11).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

11

i.   Please state your relationship (e.g., family relationship, friend, business associate, etc.) with Kyle William Hopkins and state his current residence address and telephone number. (Interrogatory number 13).

RESPONSE:  Kyle William Hopkins is my brother.  I respectfully decline to answer the rest and remainder of this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

j.   Please state your relationship (e.g., family relationship, friend, business associate, etc.) with Ryan Cavalear and state his current residence address and telephone number.  (Interrogatory number 14).

RESPONSE:  Ryan Cavalear is a friend of mine.  I respectfully decline to answer the rest and remainder of this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

k.   Please state if and when you returned to Delaware following your travel to Nevada in January 2013 and describe your travel itinerary for the remainder of your travel following the currency seizure.  (Interrogatory number 15).

RESPONSE:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

l.   Please state whether you have visited or traveled through Nevada during 2011, 2012, or 2013, other than your travel in January 2013, during which the currency was seized.  If your answer is in the affirmative, state the dates of such visits/travels, the purpose(s) of such visits/travels, the mode of transportation you used to travel to and from Nevada, and the names and addresses of any persons who accompanied you on any portion of such travels.  (Interrogatory number 16).

RESPONSE:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

m.   Please state whether you received any portion of the defendant currency through an inheritance, trust distribution, or gift.  If your answer is "yes," please  (1) state when and from whom you received the inheritance, trust distribution, or gift, (2) a description of any other property you received from the same source, (3) your relationship to the person from you received the inheritance, trust distribution, or gift, and (4) the names and current addresses and relationship to you of any other persons who received an inheritance, trust distribution, or gift from the same estate.  (Interrogatory number 17).

RESPONSE:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

n.   For the time period January 1, 2008, to present, please state whether you have made debits on, deposits into, or withdrawals from any account for which you have had signatory authority at any bank or other financial institution.  The phrase "deposits into or withdrawals from" includes but is not limited to electronic debits, deposits, or withdrawals authorized by you.  The term "debits on" includes credit transactions, purchases through debit or credit transactions, and cash advances obtained through debit or credit transactions.  The term "account" includes any checking account, savings account, money market account, brokerage account, credit card account (e.g., Visa, Mastercard, Amex, Discover, etc.), or any cash or credit maintenance relationship you have with any financial institution.  (Interrogatory number 18).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

o.      For each of the years 2008, through 2012, please state whether you have filed a federal income tax return.  If your answer is "no" for any such year, please state the factual basis for the non-filing.  (Interrogatory number 20).

<u>RESPONSE</u>:  I respectfully decline to answer this question pursuant to my rights under the Fifth Amendment to the Constitution of the United States.

<u>See</u> Addington Decl., ¶ 4 and <u>Exhibit A</u> thereto.

18.      Responding to each of the individual US requests for production of documents, Gorman stated:  "I respectfully decline to respond to this request pursuant to my rights under the Fifth Amendment to the Constitution of the United States."  The US document production requests included requests for income tax returns, banking records, and other documents which support Gorman's claim of ownership regarding the defendant currency.  Gorman produced no documents.

<u>See</u> Addington Decl., ¶ 5 and <u>Exhibit A</u> thereto.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  *N. W. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994).  The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court should enter summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  FED.R.CIV.P. 56(c).  Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.  FED.R.CIV.P. 50(a).  A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth.  *Lynn v. Sheet Metals Workers Int'l Ass'n*, 804 F.2d 1472, 1483 (9th Cir. 1986), *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).  Where reasonable minds could differ on the

material facts at issue, however, summary judgment should not be granted.   *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).   Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.   *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   Although the parties may submit evidence in an inadmissible form – namely, depositions, admissions, interrogatory answers, and affidavits – only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.   FED.R.CIV.P. 56(c); *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988).   "A mere scintilla of evidence will not do, for a jury is permitted only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation."   *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).   Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment.   *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In deciding whether to grant summary judgment, a court must take three necessary steps:  (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.   *Anderson,* 477 U.S. at 248.   Summary judgment is not proper if material factual issues exist for trial.   *B.C. v. Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir. 1999).   "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."   *Anderson,* 477 U.S. at 248.   Disputes over irrelevant or unnecessary facts should not be considered.   *Id.*   Where there is a complete failure of proof on an essential element of the nonmoving party's case,

1   all other facts become immaterial, and the moving party is entitled to judgment as a matter of law.

2   *Celotex,* 477 U.S. at 323.  Summary judgment is not a disfavored procedural shortcut, but rather an

3   integral part of the federal rules as a whole.  *Id.*

4        If the nonmoving party fails to present an adequate opposition to a summary judgment motion,

5   including the evidence which supports the nonmoving party's argument, the court need not search the

6   entire record for evidence that demonstrates the existence of a genuine issue of fact.  *See Carmen v.*

7   *San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029-31 (9th Cir. 2001).  The court need not "scour

8   the record in search of a genuine issue of triable fact," but rather must "rely on the nonmoving party to

9   identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v.*

10  *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251

11  (7th Cir. 1995)).  It is the duty and burden of the nonmoving party to identify the reasons why

12  summary judgment should not be granted and the evidentiary basis for those reasons.  *Reese v.*

13  *Jefferson Sch Dist No 14J*, 208 F.3d 736 (9th Cir. 2000).  "But if the nonmoving party fails to

14  discharge that burden – for example by remaining silent – its opportunity is waived and its case is

15  wagered."  *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).  It is likewise

16  insufficient for the nonmoving party to simply assert that it will be able to discredit the movant's

17  evidence at trial.  *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractor's Ass'n*, 809 F.2d 626, 630 (9th

18  Cir. 1987); Rule 56(e), Fed.R.Civ.P.

19       Responding to a motion for summary judgment, the nonmoving party "cannot rely on the hope

20  that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present

21  affirmative evidence in order to defeat a properly motion for summary judgment.'"  *Street v. JC*

22  *Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), *quoting Anderson*, 477 U.S. at 257.  Moreover,

23  it is not sufficient for the nonmoving party to merely "show that there is some metaphysical doubt as

24  to the material fact."  *JC Bradford*, 886 F.2d at 1480, *quoting Matsushita*, 475 U.S. at 586.

1    The standard for determining a motion for summary judgment is the same standard used to

2 determine a motion for directed verdict:   Does the evidence present a sufficient disagreement to

3 require submission to a jury or is it so one-sided that one party must prevail as a matter of law?

4 *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

5    Based on these standards, this court should grant the United States' motion for summary

6 judgment.

7 IV.  SUMMARY JUDGMENT AND CIVIL FORFEITURE ACTIONS

8    Summary judgment is appropriate in civil forfeiture actions based on the substantive forfeiture

9 law applicable to the case and the evidentiary burdens that law places on the respective parties.  *See*

10 *Anderson*, 477 U.S. at 252-56 (noting that "the judge must view the evidence presented through the

11 prism of the substantive evidentiary burden."); *United States v. U.S. Currency in the Amount of*

12 *$42,500*, 283 F.3d 977, 979 (9th Cir. 2002); *United States v. One Parcel of Real Property*, 904 F.2d

13 487, 490 (9th Cir. 1990); *United States v. One 1987 Mercedes Benz 300E*, 820 F.Supp. 248 (E.D.Va.

14 1993)(granting summary judgment to government where there was no material issue of fact).

15    Despite the fact that forfeiture cases often are characterized by competing explanations about

16 the events surrounding the seizure of the defendant property, summary judgment can nonetheless be

17 properly granted through application of the summary judgment standard and the applicable substantive

18 forfeiture law.  *See United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir.

19 2008)(affirming district court's grant of summary judgment for civil forfeiture of currency); *United*

20 *States v. Approximately $1.67 Million (US) in Cash, etc.*, 513 F.3d 991, 999 (9th Cir. 2008)(affirming

21 district court's grant of summary judgment forfeiture based on circumstantial evidence linking subject

22 funds to drug trafficking); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 644 (9th Cir.

23 2012)(affirming district court's grant of summary judgment due to claimant's failure to substantiate

24 assertions contesting forfeiture).

1    In a civil forfeiture action, the initial burden of proof is on the government to establish by a

2    preponderance of the evidence that the property in question is subject to forfeiture.  *See* 18 U.S.C. §

3    983(c).  Thus, the government need only show that it is "more likely than not" that the defendant

4    property is subject to forfeiture.  *Guglielmino v. McKee Foods Corp.*, 506 F.3d 696 (9th Cir. 2007)(re-

5    iterating that the "preponderance of the evidence" standard in the Ninth Circuit is "more likely than

6    not");  *see United States v. Real Property in Santa Paula, CA*, 763 F.Supp.2d 1175, 1184 (C.D.Cal.

7    2011)("The government must prove by a preponderance of the evidence that the property is subject to

8    forfeiture...This standard of proof requires that the government show that it is more likely than not that

9    the property is subject to forfeiture.").  This determination is not based upon each fact in the abstract

10   but rather upon "the aggregate of facts, including circumstantial facts."  *$42,500 in US Currency*, 283

11   F.3d at 980 (9th Cir. 2002); *United States v. $49,790 in US Currency*, 763 F.Supp.2d 1160, 1167

12   (N.D.Cal. 2010)("The determination whether the government has met its burden of proof is based on

13   the aggregate of the facts, including circumstantial evidence."); *United States v. $97,667.00 in US*

14   *Currency*, 538 F.Supp.2d 1246, 1253 (C.D.Cal. 2007)("In assessing whether Plaintiff has met this

15   burden, the Court looks to the totality of the circumstances.").

16   Under 21 U.S.C. § 881(a)(6), seized currency is subject to forfeiture  (1) if it is intended to be

17   furnished by a person in exchange for a controlled substance, (2) if it is proceeds traceable to such an

18   exchange, or (3) if it is used or intended to be used to facilitate any violation of the Controlled

19   Substances Act.  In determining whether the defendant is subject to forfeiture under section 881(a)(6),

20   the United States may rely on evidence gathered after the complaint was filed.  *See* 18 U.S.C. §

21   983(c)(2)("The Government may use evidence gathered after the filing of the complaint for forfeiture

22   to establish, by a preponderance of the evidence, the property is subject to forfeiture.").  Moreover, it

23   is well settled that the United States does not need to connect the defendant currency to "a particular

24   drug transaction."  *See United States v. $21,055.00 in U.S. Currency*, 778 F.Supp.2d 1099, 1103

17

(D.Kan. 2011).  Rather, the United States must simply show, given the totality of the circumstances, that it is more likely than that the defendant currency is related to drug trafficking.  *United States v. $242,484.00 in U.S. Currency*, 389 F.3d 1149, 1160 (11th Cir. 2004); *United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 469 (7th Cir. 2005)(affirming district court's grant of summary judgment based on finding "that an examination of all the evidence indicated 'a pattern that is consistent with illegal narcotics transactions.'"); *United States v. Parcels of Land*, 903 F.2d 36, 38-39 (1st Cir. 1990); *United States v. $41,305.00 in Currency and Travelers Checks*, 802 F.2d 1339, 1343 (11th Cir. 1986).

After the United States has met its burden by a preponderance of the evidence, the burden shifts to the claimant to prove, also by a preponderance of the evidence, that the currency was *not* connected with illegal drug trafficking.  *$42,500 in US Currency*, 283 F.3d at 980 (9th Cir. 2002); *United States v. $433,980.00 in U.S. Currency*, 473 F.Supp.2d 685, 691 (E.D.N.C. 2007).  The claimant must produce evidence from which "a fair-minded jury could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 252.  Further, "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact," the individual seeking to reclaim the res must actually present *evidence* beyond mere unfounded assertions in order to survive a motion for summary judgment.  *$133,420 in US Currency*, 672 F.3d at 638-39 (9th Cir. 2012); *United States v. $86,020.00 in U.S. Currency*, 1 F.Supp.2d 1034, 1037-38 (D.Ariz. 1997)(identifying and discussing relevant factors regarding shifting burden of proof).

As demonstrated below, the aggregate of facts supports the grant of summary judgment of forfeiture against the defendant currency.  The factual presentation by the United States is bolstered by the adverse inference which arises from Gorman's choice to remain silent in response to the government's discovery requests. Moreover, the factual presentation by the United States is unrebutted

1    because Gorman may not now present evidence to support his claim when he, as a litigation strategy,

2    has refused to disclose that evidence during discovery.

3    V.  FACTORS SUPPORTING SUMMARY JUDGMENT OF FORFEITURE

4            In civil forfeiture litigation involving large cash seizures, it is uncommon for there to be direct

5    evidence linking the seized property to drug trafficking.  Rather, the forfeiture effort typically is based

6    on circumstantial evidence and the cumulative effect of various circumstantial evidence which tends to

7    either diminish or enhance the likelihood that the seized currency is linked to illegal drug trafficking.

8    The established summary judgment calculus in civil forfeiture actions recognizes the factors which are

9    relevant to the analysis.  Such factors include:  the quantity of currency seized, the location and

10   packaging of the currency, the presence of a positive alert by a trained drug-detection canine, the

11   claimant's travel itinerary surrounding the seizure, the claimant's reported income prior to the seizure,

12   claimant's criminal history involving drug offenses, and the lack of documentation to substantiate

13   claimant's narrative regarding the source and purpose of the currency.  *See e.g., Funds in the Amount*

14   *of $30,670*, 403 F.3d at 467-69 (7th Cir. 2005)(discussing relevant factors).

15           As discussed below, *all* of the relevant evidence weighs against Gorman and amply supports

16   the forfeiture claims of the United States.

17           A.  Large Quantity of Cash and Manner of Packaging

18           The amount of U.S. currency (cash) discovered in the white motorhome being driven by

19   Gorman during the January 2013 traffic stop can only be characterized as extraordinary.  The sum of

20   $167,070.00 was discovered in the motorhome (which Gorman did not own), including 7,129 twenty-

21   dollar bills, 167 fifty-dollar bills, and 143 hundred-dollar bills.  Such a cash hoard being transported in

22   a motorhome, particularly the huge number of small-denomination bills bundled with rubber-bands

23   and packaged in vacuum-sealed plastic bags, is highly suggestive of drug activity.  *United States v.*

24   *$159,880.00 in U.S. Currency, More or Less*, 387 F.Supp.2d 1000, 1013 (S.D.Iowa 2005).

The presence of a large quantity of cash has strong probative value regarding its forfeiture. Courts have made the common-sense observation many times that "a large amount of currency is strong evidence that the money was furnished or intended to be furnished in return for drugs." *$49,790.00 in U.S. Currency*, 763 F.Supp.2d at 1167-68 (N.D.Cal. 2010), *citing $42,500 in US Currency*, 283 F.3d at 981-82 (9th Cir. 2002); *$86,020.00 in U.S. Currency*, 1 F.Supp.2d at 1037 (D.Ariz. 1997)("Even without the presence of drugs or drug paraphernalia, carrying a large sum of cash is *strong evidence* of some relationship with illegal drugs." (Italics in original)), *citing United States v. U.S. Currency, $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988); *$159,880.00 in US Currency*, 387 F.Supp.2d at 1013 (S.D.Iowa 2005)(same).   The Eleventh Circuit has offered a compelling explanation for the intuitive notion that individuals carrying large quantities of cash bundled together with rubber-bands likely are engaged in illegal drug trafficking:

> A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from authorities...
>
> Legitimate businesses wire cash between bank accounts or they convert large sums of cash into cashier's checks...[W]iring a sum of money that large would have generated a currency transaction report, something that those who deal in drug proceeds want to avoid at all costs... Although the quantity of cash alone is not enough to connect it to illegal drug transactions, it is a significant fact and weighs heavily in the probable cause calculus.

*$242,484 in US Currency*, 389 F.3d at 1160-61 (11th Cir. 2004)(internal citations omitted).  *See also United States v. $22,991.00, more or less, in US Currency*, 227 F.Supp.2d 1220, 1232 (S.D.Ala. 2002)("First, the defendant currency, $22,991.00, is an unusually large amount of cash to be transported in the trunk of an automobile. [...] The Court deems this to be highly probative, although not dispositive, circumstantial evidence of a link between this exorbitant amount of cash and illegal

drug activity. Courts have recognized that, for purposes of a civil forfeiture action, the possession of a large sum of currency is strong evidence of narcotics trafficking.").[3]

The fact that the seized currency was found in storage cabinets, in the microwave oven, and in the refrigerator within the motorhome and was organized into multiple bundles bound with rubber-bands and was comprised, in part, of over 7000 twenty-dollar bills is also strongly suggestive of a drug trafficking nexus. *See $159,880.00 in U.S. Currency*, 387 F.Supp.2d at 1013 (S.D.Iowa 2005)("Rather than obtain cashier's checks or converting smaller denominations into larger ones, Claimants rubber-banded the cash into 21 bundles and put it into a plastic bag placed inside a duffel bag.  The Court finds this method of transporting funds provides further evidence that the cash was connected to drug activity."); *see also United States v. $50,720.00 in U.S. Currency*, 589 F.Supp.2d 582, 583 (E.D.N.C. 2008)("Included among this evidence is the large quantity of currency in unusual and suspicious denomination breakdowns.").[4]

The bundles of currency found in the motorhome being driven by Gorman were located in vacuum-sealed plastic bags commonly used for food storage.  Such packaging is highly suggestive of efforts to mask the odors associated with drug trafficking to avoid detection by trained drug-detection canines.  *$42,500 in US Currency*, 283 F.3d at 983 ("Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money.  Rather cellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs."); *United States v. $129,727 in US Currency*, 129 F.3d 486, 490 (9th Cir. 1997)(linking money

---

[3]    "The Second Circuit characterized an amount as low as $2,500 as being substantially greater than is commonly kept in residential premises by law-abiding wage earners.  *United States v. $2,500 in US Currency*, 689 F.2d 10, 16 (2d Cir. 1982), *cert, denied*, 465 U.S. 1099 (1984)."  *$86,020.00 in US Currency*, 1 F.Supp.2d at 1037 n.4. (D.Ariz. 1997).

[4]    The "suspicious denomination breakdowns" identified by the court in *$50,720.00 in US Currency* was as follows:  63 $100 bills, 132 $50 bills, 1,859 $20 bills, and 64 $10 bills.  *$50,720.00 in U.S. Currency*, 589 F.Supp.2d at 583 (EDNC 2008).  The currency located in the motorhome being driven by Gorman had a similar breakdown, albeit with a larger cumulative total.

1   wrapped in fabric softener sheets and plastic wrap with drug related activity); *$49,790 in US*

2   *Currency*, 763 F.Supp.2d at 1167 ("Like cellophane, vacuum-sealed plastic bags are highly

3   impermeable to gas and commonly used to stave off detection by trained dogs.").

4         B.  Other Drug-Related Items Found with Currency

5         In addition to the very large quantity of currency located in the motorhome being driven by

6   Gorman, the search of the motorhome yielded the discovery of "pay/owe" sheets consistent with

7   marijuana trafficking.  The search also yielded the discovery of empty duffel bags and another empty

8   hard-sided case, consistent with bulk marijuana trafficking.  The motorhome also contained a map

9   showing driving directions from Gorman's residence in Delaware, to Garberville, California – an area

10   in northern California renowned for large-scale marijuana cultivation and distribution (and contrary to

11   Gorman's statement that he was traveling to Sacramento to visit his friend).  Gorman's backpack in

12   the motorhome also contained a prescription strength inhaler in another person's name.

13         The presence of drug paraphernalia, such as the "pay/owe" sheets, the large empty containers,

14   and the driving directions to Garberville, is circumstantial evidence relevant to the summary judgment

15   calculus and supportive of the forfeiture claims.  *See United States v. $93,685.61 in U.S. Currency*,

16   730 F.2d 571, 572 (9th Cir. 1984)(describing drug paraphernalia located with seized money as

17   persuasive circumstantial evidence); *$86,020.00 in U.S. Currency*, 1 F.Supp.2d at 1038 (D.Ariz.

18   1997)(noting that claimant's carry-on bags contained animal repellent, a heat sealer with instructions,

19   plastic bags and wrapping tape and that such circumstantial evidence supports inference of drug

20   nexus); *$50,720.00 in U.S. Currency*, 589 F.Supp.2d at 583 (E.D.N.C. 2008)(strong odor of air

21   freshener, two cellular telephones, and claimant/driver's nervousness probative of drug activity);

22   *$30,670 in US Currency*, 403 F.3d at 467 (travel to known source city for illegal narcotics relevant to

23   summary judgment analysis and citing cases).

24

C.  Odor of Marijuana

Prior to the search of the motorhome, Euros - a trained drug-detection canine - alerted positively to the exterior of the motorhome indicating the presence of the odor of drugs around the motorhome.  Euros also alerted to various locations inside the motorhome after a search warrant had been obtained – indicating the presence of the odor of drugs inside the motorhome.  These alerts by a trained drug-detection canine provide strong circumstantial evidence of drug activity associated with Gorman and the currency.

At one time, positive dog alerts were regarded as having little probative value because of the popular notion that most currency in general circulation was contaminated with detectable amounts of cocaine residue.  *See United States v. U.S. Currency in the Amount of $30,060.00*, 39 F.3d 1039 (9th Cir. 1994).  Such cases now are recognized as anachronisms given the current understanding of the biochemistry of dog alerts and the obvious fact that trained drug-detection canines do not alert to the "background contamination" on all currency in general circulation.  Rather, properly trained canines alert to the ephemeral chemical byproducts of cocaine processing (if the canine is alerting to a cocaine stimulus).  If the canine is alerting to the odor of marijuana, such an alert is a reliable indicator of a nexus to recent marijuana-related drug activity because currency in general circulation is not contaminated with marijuana residue (as might be the case with cocaine).  In either event – whether the canine is trained to alert to a cocaine stimulus or to a marijuana stimulus (or both) – the positive dog alert is circumstantial evidence highly suggestive of recent drug-related activity and supports the reasonable inference that the subject currency is factually linked to recent drug activity.  *See $42,500.00 in U.S. Currency*, 283 F.3d at 982 (9th Cir. 2002); *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001); *see also $242,484 in U.S. Currency*, 389 F.3d at 1165-67 (11th Cir. 2004)(dog alert entitled to probative weight); *Funds in the Amount of $30,670.00*, 403

1   F.3d at 455-56 (7th Cir. 2005)(same); *$159,880.00 in U.S. Currency*, 387 F.Supp.2d at 1015

2   (S.D.Iowa 2005) (same); *$50,720.00 in U.S. Currency*, 589 F.Supp.2d at 584 (EDNC 2008)(same).

3                    D.  Adverse Inference From Gorman's Refusal To Provide Discovery Responses

4          Responding to the U.S. interrogatories and the U.S. request for production of documents,

5   Gorman elected to provide no substantive or meaningful information and elected to produce no

6   documents.  Instead, Gorman invoked his Fifth Amendment privilege against self-incrimination in

7   response to interrogatories requesting information about how he acquired ownership or possession of

8   the defendant currency, his employment history, the purpose of his cross-country trip in a motorhome

9   which did not belong to him, whether the defendant currency represented income earned by him from

10  any source, whether the defendant currency had been withdrawn from a bank or other financial

11  institution, his criminal history, whether the defendant currency had been inherited by him or gifted to

12  him, and whether he has filed federal income tax returns for the five years prior to the currency

13  seizure.  Likewise, Gorman invoked his Fifth Amendment privilege against self-incrimination in

14  response to document production requests for his income tax returns, for relevant banking records, and

15  for other records which would support his claim in this action.

16         It is well established that an adverse inference may be drawn against a party in a civil action

17  who refuses to answer questions by invoking the Fifth Amendment privilege.  *Baxter v. Palmigiano*,

18  425 U.S. 308, 320 (1976).  "Though constitutionally protected, a civil litigant's invocation of the

19  privilege against self incrimination during the discovery process is far from costless."  *United States v.*

20  *4003-4005 5th Ave.*, 55 F.3d 78, 82 (2d Cir. 1995).  "The Supreme Court has recognized the prevailing

21  rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when

22  they refuse to testify in response to probative evidence offered against them."  *United States v. Suman*,

23  684 F.Supp.2d 378 (S.D.N.Y. 2010).  Taken together with other factors which support the forfeiture

24  claims of the United States, the adverse inference which arises from invoking the Fifth Amendment

privilege is a permissible and significant factor to consider in the summary judgment analysis. *United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1128-29 (11th Cir. 1996)(affirming district court's use of adverse inference against claimants in granting summary judgment of forfeiture); *United States v. $130,052 in US Currency*, 909 F.Supp. 1506, 1517 (M.D.Ala. 1995)(drawing adverse inference against claimant in civil forfeiture action and granting summary judgment to government); *United States v. All Assets and Equipment of Westside Buliding Co.*, 843 F.Supp. 377 (N.D.Ill. 1994); *see also Libutti v. United States*, 178 F.3d 14, 117-120 (2d Cir. 1999)(adverse inference permissible even when witness, rather than party, invokes Fifth Amendment).

An adverse inference is appropriate in this forfeiture action.  Gorman asserts in conclusory terms that he is the owner of the defendant currency and that the currency is not subject to forfeiture but yet refuses, on Fifth Amendment grounds, to provide *any* meaningful information in response to the US's discovery requests.  Gorman does not identify any criminal proceeding which is pending or which is anticipated or threatened as a justification for invoking his Fifth Amendment privilege.  It is apparent that Gorman is simply using the Fifth Amendment privilege as a means to avoid his ordinary discovery obligations in this civil forfeiture action (notably, Gorman did not *object* to any of the discovery requests but rather declined to answer or respond based *solely* on Fifth Amendment grounds).  *See United States v. Rubio-Topete*, 999 F.2d 1334, 1338 (9th Cir. 1993)("The standard for determining whether a claim of privilege is justified is whether the claimant is confronted by substantial and real, and not merely trifling or imaginary, hazards of incrimination." (internal quotes and cites omitted)).

It belies common sense that if Gorman actually possessed reliable information and documents to support his claim of a legitimate source of the defendant currency he would nonetheless refuse to disclose that information and those documents during discovery because of some abstract and unfocused regard for self-incrimination.  The appropriate adverse inference from Gorman's responses

to discovery is that he has refused to provide any information because the source of the currency was illegal drug trafficking.

E. Summary

The summary judgment analysis requires an examination of the aggregate facts in light of the substantive law of forfeiture and the applicable burden of proof.  Typically, the claimant urges individual analysis of each isolated fact or circumstance with minimal evidentiary value placed on each fact.  The courts uniformly have rejected this approach.  Instead, the totality of circumstances as a whole and in the appropriate context is to be considered.  *See $42,500.00 in US Currency*, 283 F.3d at 981 (9th Cir. 2002)(finding that although some factors taken alone may be innocent, "the aggregate of facts raise more than a mere suspicion of a connection between money and drugs."); *see also $242,484.00 in US Currency*, 389 F.3d at 1160 (11th Cir. 2004(en banc)("In evaluating the evidence of proceeds traceable to drug transaction, we ...eschew[] clinical detachment and endorse[] a common sense view to the realities of normal life applied to the totality of the circumstances.")(internal quotation marks, brackets, and citation omitted); *United States v. One Lot of US Currency ($36,634)*, 103 F.3d 1048, 1054 (1st Cir. 1997)("Even where no particular circumstance is conclusive, it is the aggregate of the facts that is examined.");  *Funds in the Amount of $30,670.00*, 403 F.3d at 469 (7th Cir. 2005)(declining to "implement [claimant's] divide-and-conquer approach with respect to the factors present in this case.  Instead, we consider the totality of the evidence as a whole and in the appropriate context.").

Properly considered and evaluated, the aggregate of facts described above – including the adverse inference from Gorman's use of the Fifth Amendment privilege - support the entry of summary judgment of forfeiture pursuant to 21 U.S.C. § 881(a)(6).

1    VI.  Gorman Is Precluded From Rebutting The Government's Factual Presentation.

2          As discussed above, Gorman's refusal to respond meaningfully to the US's discovery efforts,

3    based on Fifth Amendment grounds, results in a permissible adverse inference against Gorman's claim

4    in the summary judgment calculus.  In addition to that adverse inference supporting the United States'

5    forfeiture claims herein, Gorman's invocation of the Fifth Amendment to avoid his discovery

6    obligations also precludes him from introducing any evidence to rebut the government's summary

7    judgment motion.

8          Gorman invoked his Fifth Amendment right against self-incrimination instead of answering

9    interrogatories about how he acquired ownership or possession of the defendant currency, his

10   employment history, the purpose of his cross-country trip in a motorhome which did not belong to

11   him, whether the defendant currency represented income earned by him from any source, whether the

12   defendant currency had been withdrawn from a bank or other financial institution, his criminal history,

13   whether the defendant currency had been inherited by him or gifted to him, and whether he has filed

14   federal income tax returns for the five years prior to the currency seizure.  Likewise, Gorman invoked

15   his Fifth Amendment privilege against self-incrimination in response to document production requests

16   for his income tax returns, for relevant banking records, and for other records which would support his

17   claim in this action.

18         The assertion of the Fifth Amendment may be a legitimate reason for refusing to answer a

19   question but it cannot be used to avoid the Rule 56(c) requirement to oppose the movant's factual

20   presentation supporting summary judgment motion with an affidavit or declaration setting out facts

21   which would be admissible in evidence.

22         The Ninth Circuit addressed this very issue in *United States v. $133,420 in US Currency*, 672

23   F.3d 629 (9th Cir. 2012).  In the context of a civil forfeiture action, the Court explained the *civil*

24   application of the long-standing rule in *criminal* proceedings which permits a district court to strike

27

the testimony of a witness in a *criminal* proceeding to avoid a witness's improper use of the Fifth Amendment privilege as a sword as well as a shield. The Ninth Circuit stated as follows:

> Although we have not yet considered a district court's application of this rule in a civil proceeding, we see no reason to depart from our long-standing doctrine here.  As five of our sister circuits have held, the rule is equally applicable in civil proceedings.  *See $148,000*, 521 F.3d at 1277 (10th Cir.)("It is well established that in a civil case a district court may strike conclusory testimony if the witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause."); *United States v, 4003-4005 5th Ave,* 55 F.3d 78, 84-85 (2d Cir. 1995)("if it appears that a litigant has sought to use the Fifth Amendment to abuse or obstruct the discovery process, trial courts, to prevent prejudice to opposing parties, may adopt remedial procedures or impose sanctions."); *Edmond v. Consumer Prot. Div. (In re Edmond)*, 934 F.2d 1304, 1308 (4th Cir. 1991)("[T]he Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion."); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990)(holding in a civil forfeiture action that "a witness' direct testimony can be stricken if she invokes the fifth amendment on cross-examination to shield that testimony from scrutiny."); *United States v. Baker*, 721 F.2d 650 (8th Cir, 1983)(per curiam); *see also Lawson,*, 837 F.2d at 656. Preserving the integrity and the truth-seeking function of the judicial process is as important in civil as in criminal proceedings. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008)(affirming district court's refusal to allow a witness to testify on particular subject at trial when the Fifth Amendment had been used to block inquiry into that subject during a deposition).

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

> Louis used the Fifth Amendment privilege to avoid answering further questions as to the "dates, time, place and manner in which the defendant currency[ ] was obtained" and the "circumstances of each transaction by which [he] acquired or obtained any interest in the defendant currency," thereby frustrating the government's attempts to test the veracity of his claim of ownership.  In so doing, Louis impaired the truth-seeking function of the judicial process.  Indeed, his claim of privilege here raises the core concern that his testimony may "furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition."  *St. Pierre*, 132 F.2d at 840.  Because Louis' testimony regarding his ownership was central to the issue before the court, and because his refusal to respond to the government's questions threatened to "mutilate the truth a party offers to tell," *Lawson*, 837 F.2d at 656, the

district court did not abuse its discretion by striking Louis's response to Interrogatory No. 2.

*$133,420 in US Currency*, 672 F.3d at 641-42.

The Ninth Circuit's holding in *$133,420 in US Currency*, coincides with similar case authority which precludes improper use of the Fifth Amendment privilege to manipulate the judicial process. Once the privilege is invoked, a civil forfeiture claimant cannot testify at trial or oppose the government's motion for summary judgment through affidavits. *United States v. $60,000 in US Currency*, 763 F.Supp. 909, 913 (E.D.Mich. 1991). When the Fifth Amendment is claimed, the litigant is barred from introducing other evidence on that issue. *Dunkin Donuts, Inc. v. Toseshi*, 47 F.Supp.2d 867, 872 (E.D.Mich. 1999). Whether one's metaphor of choice is shields and swords or parries and thrusts, the point is the same:  A litigant may not invoke the Fifth Amendment to avoid answering questions in discovery and then cry foul when the absence of evidence in favor of the litigant requires summary judgment to be entered against him. *See United States v. The Sum of $185,336.07 etc.*, 858 F.Supp.2d 246, 250 (W.D.N.Y. 2012)("In short, having long prevented the Government from proving or disproving his defense that the monies at issue were lawfully obtained, the claimant cannot now, at the final hour, purport to prove that defense with 'evidence' that has been undisclosed, unconfirmed, and hidden from cross-examination solely by his own, purposeful and strategic tactic."); *United States v. $185,000 in US Currency*, 455 F.Supp.2d 145, 150-151 (E.D.N.Y. 2006)(striking affidavit of claimant who previously had asserted Fifth Amendment privilege and granting summary judgment for government); *United States v. $174,206.00 in US Currency*, 320 F.3d 658, 662 (6th Cir. 2003); *United States v. Certain Real Property at 566 Hendrickson Blvd.*, 986 F.2d 990, 996 (6th Cir. 1993)(A "[c]laimant cannot avoid completely his Rule 56 burden by merely asserting a Fifth Amendment privilege."); *Lasalle Bank v. Seguban*, 937 F.Supp. 1309, 1320 (N.D.Ill. 1996)(Fifth Amendment protections cannot be "invoked to oppose discovery and then be tossed aside

to support a party's assertions"); *City of Chicago v. Reliable Truck Parts, Inc.*, 822 F.Supp. 1288, 1294 (N.D.Ill. 1993)("individuals who have asserted their Fifth Amendment privileges cannot now submit their own testimony or affidavits").

Having made the tactical and strategic choice to avoid his discovery obligations by invoking the Fifth Amendment privilege, Gorman is now precluded from presenting any evidence to support his claim that the defendant currency was acquired through legitimate means.

VII.  Conclusion

Based on the foregoing, summary judgment should be entered in favor of the United States against the defendant currency and against Gorman's claim thereto.

Respectfully submitted,

DANIEL G. BOGDEN
United States Attorney


 _/s/ Greg Addington_____
GREG ADDINGTON
Assistant United States Attorney

CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing UNITED STATES' MOTION FOR SUMMARY JUDGMENT, DECLARATION OF GREG ADDINGTON, and DECLARATION OF DOUG FISHER was made through the Court's electronic filing and notice system or, as appropriate, by sending a copy of same by first class mail, addressed to the following addressee, on this 18th day of February, 2014.

Michael Cristalli, Esq.
Vincent Savarese III, Esq.
GORDON SILVER
3960 Howard Hughes Parkway, 9th Floor
Las Vegas, NV  89169

  /s/ Greg Addington_____
GREG ADDINGTON