1

2

3

4

5

6                              UNITED STATES DISTRICT COURT

7                                    DISTRICT OF NEVADA

8                                           * * *
                                              )
9    UNITED STATES OF AMERICA,                )
                                              )
10                          Plaintiff,        )          3:13-CV-00324-LRH-VPC
       v.                                     )
11                                            )
     $167,070.00 IN UNITED STATES             )          ORDER
12   CURRENCY,                                )
                                              )
13                          Defendant.        )
     _____ )
14                                            )
     STRAUGHN SAMUEL GORMAN,                  )
15                                            )
                            Claimant.         )
16   _____ )

17         This is a civil forfeiture action arising from two successive traffic stops that occurred on a

18   stretch of Interstate 80 ("I-80") between Wells, Nevada, and Elko, Nevada.  On February 18, 2014,

19   Plaintiff the United States of America ("United States") filed a Motion for Summary Judgment

20   (Doc. #11), which the Court denied on July 23, 2014 (Doc. #28).  Before the Court is Claimant

21   Straughn Gorman's ("Gorman") Motion to Suppress.  Doc. #18.[1]  The United States filed a

22   Response (Doc. #24), to which Gorman replied (Doc. #27).  The Court held an evidentiary hearing

23   on December 15 and 16, 2014, during which the Court viewed the video of both traffic stops and

24   heard deposition testimony from the officer who effectuated the first stop, and live testimony from

25   the officer who effectuated the second stop.  After the hearing, Gorman submitted supplemental

26   _____
            [1]  Refers to the Court's docket number.

briefing.  Doc. #61.  The United States filed a Supplemental Opposition (Doc. #62), to which Gorman replied (Doc. #63).

On February 24, 2015, the Court stayed consideration of Gorman's Motion to Suppress pending the Supreme Court's decision in *Rodriguez v. United States*, recognizing that *Rodriguez* could impact the law underlying this case.  Doc. #64.  The Supreme Court decided *Rodriguez* on April 21, 2015.  The parties filed responsive memoranda on May 5 and 6, 2015 (Doc. ##66, 68), and replies on May 21, 2015 (Doc. ##70, 71).  After considering all briefing, the arguments and evidence presented at the December 15 and 16, 2014, evidentiary hearing, and all relevant statutes and case law, the Court grants Gorman's Motion to Suppress.

## I.   Facts and Procedural History

On January 23, 2013, at approximately 9:03 a.m., Nevada State Trooper Greg Monroe ("Monroe") observed Gorman driving in the left westbound lane along I-80 just outside of Wells, Nevada.  Monroe Depo. at 46:18-21, 47:21-24.  Monroe told Gorman that he stopped Gorman for a "left-lane violation" because he was driving slowly in the left lane and traffic had backed up behind his motor home.  *Id*. at 46:3-9.  Gorman responded that he was driving in the left lane to avoid being stuck behind slow moving trucks in the right lane, and that he planned to move back to the right lane as soon as possible.  *Id.* at 59:7-13.  Upon request, Gorman produced his license and registration and told Monroe that he was traveling to Sacramento, California to visit "his chick." *Id.* at 60:9-61:5.  Gorman told Monroe that his girlfriend lived in downtown Sacramento, but was not able to produce her exact address, noting that it was entered into his GPS system.  *Id.* at 84:2-22.  Gorman's use of the word "chick" aroused Monroe's suspicion that Gorman's answers were rehearsed because Monroe thought that "chick" was an unusual word for a person Gorman's age—thirty-one at the time of the stop—to use.  *Id.* at 62:4-8; 63:12-17.  Monroe's suspicions grew "extremely high" when Gorman stated that he was *moving* to California because this was inconsistent with Gorman's earlier statement that he was *visiting* his girlfriend in Sacramento.  *Id.*
///

2

at 62:12-21.  Additionally, Gorman told Monroe that he worked for a Maui beach activities and paddle board company, which Monroe also thought sounded rehearsed.  *Id.* at 89:1-11.

After questioning Gorman, Monroe returned to his vehicle and requested a canine unit at approximately 9:07 a.m.  *Id.* at 90:18-20.  Monroe then called in for a driver's license warrant check and a criminal history check.  *Id.* at 91:13-20.  At 9:08:30 a.m., dispatch informed Monroe that there were no available canine units in Wells, to which Monroe replied "oh great" in an exasperated tone.  *Id.* at 95:19-21.  At approximately 9:09 a.m., Monroe told dispatch "without a dog I'm not even going to get in to this one."  At approximately 9:10 a.m., dispatch informed Monroe that Gorman's driver's license was valid.  *Id.* at 100:17-20.  At approximately 9:10:30 a.m., Monroe asked someone who is inaudible on the recording "how far out are you guys?" and then stated that he was going to try to get consent to search the vehicle but that he was "pretty sure" Gorman would refuse.  Monroe then said that he was between the 346 and 347 mile markers, and "if you guys don't mind start heading this way, . . . I'm going to call [El Paso Intelligence Center ("EPIC")] on this one and if the guy shuts me down, well then he shuts me down."  At approximately 9:12 a.m., Monroe called in a check with EPIC.  *Id.* at 104:25-105:5.  This call included a check of any law enforcement activities involving drugs at Gorman's residence.  *Id.* at 107:15-22.  At 9:22:30 a.m., Monroe told the EPIC operator that he did not have a canine unit available, but that he was going to try to get consent to search Gorman's vehicle.  *Id.* at 117:11-15. At 9:22:45 a.m., EPIC responded that they had a "DEA hit" on Gorman involving a transfer of $10,000 out of the country, but all other checks were negative.  *Id.* at 118:3-9.

At approximately 9:23 a.m., Monroe exited his vehicle and told Gorman that he was not going to write a ticket.  At 9:23:35 a.m., Monroe then handed Gorman his identification and told him that he was free to leave.  *Id.* at 126:16-24.  Immediately afterward, Monroe asked Gorman if he could ask some additional questions.  *Id.* at 128:12-17.  Monroe first asked how Gorman could afford to drive a motor home cross-country when gas prices were over $3.00 per gallon.  Monroe then asked if Gorman still sold paddle boards for a living, and asked about his compensation, to

which Gorman responded "I don't want to talk about how much I make."  At approximately 9:25 a.m., Monroe asked if there was anything illegal in Gorman's motor home, or if he was carrying large amounts of U.S. currency.  *Id.* at 129:17-130:3.  Gorman then told Monroe that he was only carrying about $2000 in U.S. currency in the motor home.  At 9:25:45 a.m, Monroe asked Gorman "do you mind if we search the vehicle?," to which Gorman said "I do mind, yes."  *Id.* at 131:19-23. At this point, Monroe told Gorman that he was free to leave, returned to his vehicle, and said "he's carrying money" aloud to himself.

Monroe then contacted Nevada Highway Patrol ("NHP") dispatch and informed the operator that there was a vehicle headed westbound on I-80 from Wells, Nevada that he strongly suspected was carrying large amounts of currency.  *Id.* at 135:7-13.  Monroe informed the operator that the only way to get probable cause to search Gorman's motor home would be to use a canine unit.  *Id.* at 136:3-9.  NHP dispatch then informed Elko County Sheriff's Office ("ECSO") Deputy Doug Fisher ("Fisher") that Monroe had stopped a vehicle near the 360 mile marker on I-80 near Wells, Nevada, and that Fisher might be interested in stopping the vehicle.  Fisher Depo. at 32:4-11.  Fisher was told that Gorman did not consent to the search during the first stop, and that a canine unit "might want to follow up on the information."  *Id.* at 43:18-20; 35:12-16.  Fisher understood this to mean that he may want to walk his canine around Gorman's vehicle.  *Id.* at 36:10-19.

Monroe also called Fisher directly to relay his suspicions about Gorman and that Gorman was driving westbound on I-80 from Wells, Nevada.  Monroe added that Gorman was traveling from Delaware to Sacramento to visit his girlfriend, that he had $5000 in the motor home, and that Gorman acted abrasive during the initial stop.  *Id.* at 40:1-5.  Monroe also told Fisher Gorman's name and license plate number, but did not tell Fisher which records checks he had conducted.  *Id.* at 41:7-42:20.  Monroe told Fisher that he was denied consent for a search and that he let Gorman leave because he had no probable cause for a search and no canine units were available.  *Id.* at 43:4-11.  After this call, Fisher left the ECSO and "started patrolling the highway."  *Id.* at 45:6-9.  Fisher

was on a roving patrol initially, but became stationary between the 302 and 303 mile markers on I-80, facing eastbound near Elko approximately five miles from ECSO.[2]  *Id.* at 45:10-23.

NHP dispatched Fisher to follow up on Monroe's information at approximately 9:27 a.m. Doc. #23, Ex. J at 4; Doc. #27-1, Request for Admission No. 18.  NHP further notified Fisher that Monroe released Gorman's vehicle, a white motor home, after he was denied consent to search.  *Id.* At approximately 10:15 a.m., Fisher observed Gorman's motor home traveling westbound with the driver's side window obstructed by a window curtain that had been pulled forward.  Doc. #12 ("Fisher Decl.") ¶3.  Fisher followed the motor home and observed it drift to the right onto the fog line three times and remain on the fog line each time for approximately 400 yards.[3]  *Id.*  Fisher also observed that the rear window of the motor home was obstructed by blinds or curtains that were partially closed.  *Id.*  Based on these observations, Fisher activated the overhead lights on his patrol car in an effort to initiate a stop of the motor home.  *Id.* at ¶4.  Fisher remained behind the motor home with his overhead lights activated for approximately one mile with no apparent effect on Gorman.  *Id.*  Thereafter, Fisher moved to the lane left of the motor home for an additional mile, keeping the overhead lights activated, with no apparent effect on Gorman.  *Id.*  He then activated his siren in two short bursts, again with no apparent effect on Gorman.  *Id.*  After moving his patrol car forward to the driver's side window and again activating his siren for two short bursts, Gorman stopped the motor home on the side of the road.  *Id.*

Fisher approached the right side of the motor home and Gorman exited the vehicle with his insurance, registration, and identification ready, wearing a hat, gloves, and jacket.  *Id.* at ¶5.  Fisher

---

[2] Monroe initially stopped Gorman near the 347 mile marker on I-80.  The Court notes that there was a high probability that Gorman would pass this location because the only way for Gorman to reach Sacramento going westbound on I-80 is through Elko.

[3] Fisher later contradicted the statements in the warrant application about when he first decided to effectuate the traffic stop.  Specifically, Fisher told the magistrate that he noticed the vehicle drift onto the fog line before he decided to effectuate the stop.  Doc. #18, Ex. A at 4.  At the evidentiary hearing, Fisher stated that he decided to stop the motor home after noticing that the curtain was pulled forward, and that he only noticed the purported fog line violations as he was following the vehicle immediately prior to the stop.

told Gorman the reason for the stop and further advised Gorman of the safety issue caused by the obstructed side window. *Id.* at ¶6. Gorman responded that he had been pulled over about forty minutes earlier and had been stopped for twenty minutes. *Id.* Fisher replied "I don't know if you got stopped,[4] because I get told that quite often . . . as a distraction." Gorman stated that he was traveling to Sacramento to visit his girlfriend, and then stated his intention to move to California. *Id.* Gorman also said that he worked with a paddle board company that involved other beach activities in Maui. *Id.*

Fisher returned to his patrol car, at which point the evidentiary record is contested. Specifically, the parties dispute the point at which Fisher requested a records check of Gorman. Fisher states that he paged dispatch approximately four minutes into the stop, but that dispatch did not respond to his page. U.S. Ex. 7 ¶11(f). The video of the incident does not clearly indicate whether Fisher paged dispatch. Approximately five minutes into the stop, Deputy Prall ("Prall") arrived at the scene and Fisher asked him to "stick around." *Id.* The dispatch Call for Service Report indicates that Prall requested a records check approximately six minutes into the stop, but does not indicate that Fisher paged or otherwise requested a records check. *Id.*, Ex. 4 at 1. The dispatch report also indicates that Prall requested an EPIC check approximately seven minutes into the stop. *Id.* The EPIC check indicated that Gorman had four border crossings, most recently between the United States and Spain. *Id.* Meanwhile, Fisher filled out a consent to search form for the motor home, which he never presented to Gorman because based on their interactions, Fisher believed that an attempt to get consent would be futile.

When Fisher re-approached the vehicle, he told Gorman "they're rolling some medical information at dispatch right now so I'm just going to ask you a couple questions if you don't mind." Gorman replied "I do mind. I've been asked a lot of other questions at the other place." Fisher then asked "what did he ask you?" Gorman replied "he asked me a bunch. Am I getting a ticket? Am I detained?" Fisher responded "right now you are being detained because I haven't

---

[4] Fisher acknowledged at the evidentiary hearing that this was "a lie."

even ran you through dispatch." Fisher then asked "so you don't want to answer my questions then?" Gorman replied "No I don't because I was just held for seriously twenty to thirty minutes. I answered a bunch of questions and he finally let me go. . . . I'm done talking."

Fisher asked Gorman if he had an objection to Fisher conducting a canine sniff around the motor home. Gorman responded "I have opposition, if that means anything." Fisher then conducted a weapons pat-down of Gorman and asked him to stand twenty to thirty feet in front of the motor home. Next, approximately twelve minutes in to the traffic stop, Fisher released his drug-detection canine "Euros" from his vehicle. Fisher and Euros then approached the motor home and began walking around it in the clockwise direction, starting at the rear left-hand side of the vehicle. As Fisher and Euros circled the rear of the motor home, Euros sat down near the vehicle's back right compartment, facing the compartment. Fisher described this as a "committed sit and stare," which he considered to be a positive alert. Fisher then gave Euros his ball (apparently, the dog's reward) and returned him to the vehicle.

Fisher returned to the motor home and told Gorman "Dispatch still hasn't come back with your information. He just was able to get it through. . . . Once the information comes back from dispatch you will be free to leave, but your vehicle is staying here until we figure out if we are going to do a telephonic search warrant." Gorman expressed disbelief that the dog positively alerted for drugs, and asked "did you make him alert?" Fisher responded "No. I did not make him alert." Gorman then referred to the back rear compartment and said "I can open that if you want to look in it. It's charcoal and stuff like that, do you want to look in it?" Fisher replied "do you want to talk to me now?" Gorman replied "if he alerted somewhere, look in it because there's no drugs." Fisher then noted that odor could come out anywhere on the vehicle, and that the rear back compartment was on the "down wind side of the vehicle." Fisher then returned to his vehicle, at which point the video of this stop ends.

Based on the aforementioned circumstances, Fisher applied telephonically for a search warrant from the Justice Court of Elko Township, Elko County, Nevada. *Id.* at ¶10. Fisher did not

state in his telephonic warrant application that he had first been dispatched to investigate Gorman after Monroe alerted him that Gorman was heading westbound on I-80 from Wells.[5]  An Elko County Justice of the Peace issued a warrant to search the motor home at approximately 11:15 a.m. *Id.*  The officers conducted a search of the motor home with the assistance of Euros.  *Id.* at ¶11.  During the search, Euros positively alerted to Gorman's backpack, clothes, and blankets, and the overhead storage cabinets above the master bed.  *Id.*  The search of the interior of the motor home yielded discovery of currency throughout the motor home, including in the freezer, microwave, and bedroom compartment.  *Id.* at ¶12.  The search also yielded discovery of fifteen "pay/owe" sheets, a Google Maps printout showing driving directions from Milton, Delaware to Garberville, California, a prescription inhaler containing Proventil with a prescription label designating "Ryan Cavalear" as the patient, two large empty canvas duffle-type bags, and a large hard-sided "Pelican" case.  *Id.* at ¶¶13-16.  No drugs were found.

On June 17, 2013, the United States filed a Complaint in Forfeiture *In Rem*.  Doc. #1.  On February 18, 2014, the United States filed a Motion for Summary Judgment.  Doc. #11.  Thereafter, Gorman filed the present Motion to Suppress.  Doc. #18.  On July 27, 2014, the Court denied the United States' Motion for Summary Judgment, deferred judgment on Gorman's Motion to Suppress, and set an evidentiary hearing.  Doc. #28.  The Court held an evidentiary hearing on December 15 and 16, 2014, during which the Court heard deposition testimony of Monroe, live testimony of Fisher, and reviewed the video of each traffic stop.  Following the Supreme Court's ruling in *Rodriguez*, both parties submitted memoranda on *Rodriguez*'s application to this case, and both parties thereafter submitted replies.

## II.   Legal Standard

Rule G(8)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions provides that "[i]f the defendant property was seized, a party with standing to

---

[5] In addition to this omission, Fisher stated in the warrant application that Gorman "indicated that he had no job."  Doc. #18, Ex. A at 5.  This statement is directly contradicted by the video of the traffic stop, which shows Gorman tell Fisher that he works for a paddle board company in Maui.

contest the lawfulness of the seizure may move to suppress use of the property as evidence." A motion to suppress brought by a claimant in a civil forfeiture proceeding is akin to one brought by a defendant in a criminal case. *See One 1958 Plymouth Sedan v. Pa.*, 380 U.S. 693, 696-702 (1965) (holding that the Fourth Amendment is applicable to forfeiture proceedings); *see also* Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 981(b)(2)(B) (requiring that seizures be made pursuant to a warrant or based upon probable cause and pursuant to a lawful arrest or search). As such, the exclusionary rule applies in civil forfeiture cases. *One 1958 Plymouth Sedan*, 380 U.S. at 702; *United States. v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1164 (9th Cir. 2008). The rule "bars the admission of evidence obtained in violation of the U.S. Constitution, as well as 'fruits of the poisonous tree.'" *$493,850.00 in U.S. Currency*, 518 F.3d at 1164 (quoting *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989)). "[U]nder the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible." *Id.* at 1164-65 (quoting *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)).

It is well settled that a traffic stop is a seizure within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Whren v. United States*, 517 U.S. 806, 809-10 (1996). In the context of an investigatory traffic stop, an officer need only have reasonable suspicion to justify the seizure. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (concluding that *Whren* did not alter the well settled law that reasonable suspicion is enough to support an investigatory traffic stop under the Fourth Amendment); *Brendlin v. California*, 551 U.S. 249, 263 (2007) (concluding that a seizure began at the moment the car came to a halt on the side of the road). Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in [a traffic violation]." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir.

///

9

1  1995)).  Reasonable suspicion "can rest on a mistaken understanding of the scope of a legal

2  prohibition."  *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014)

3       While an officer "may conduct certain unrelated checks during an otherwise lawful traffic

4  stop. . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion

5  ordinarily demanded to justify detaining an individual."  *Rodriguez v. United States*, 135 S. Ct.

6  1609, 1615 (2015).  An officer's prolongation of a traffic stop to conduct a dog sniff "violate[s] the

7  Fourth Amendment unless the officer had independent reasonable suspicion to support the

8  prolongations."  *United States v. Evans*, No. 14-10024, 2015 WL 2385010, at *1 (9th Cir. May 20,

9  2015).  "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is

10  determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and

11  attend to related safety concerns."  *Rodriguez*, 135 S. Ct. at 1614.  "In assessing whether a

12  detention is too long in duration to be justified as an investigative stop," it is proper "to examine

13  whether the police diligently pursued a means of investigation that was likely to confirm or dispel

14  their suspicions quickly."  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Ultimately, the

15  analysis remains one of reasonableness, and thus the court must examine the "totality of the

16  circumstances" surrounding the stop to determine whether the length is reasonable.  *See United*

17  *States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008).

18  **III.   Discussion**

19       **A.   Reasonable Suspicion for the Traffic Stops**

20       The Supreme Court held recently that reasonable suspicion "can rest on a mistaken

21  understanding of the scope of a legal prohibition."  *Heien*, 135 S. Ct. at 536.  The Court noted that

22  "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on

23  the part of government officials."  *Id.*  In order to be valid under the Fourth Amendment, an

24  officer's reasonable mistake of law must be "*objectively* reasonable," and courts should not

25  "examine the subjective understanding of the particular officer involved."  *Id.* at 539 (emphasis in

26  original).

10

Monroe stated in his deposition that he decided to pull Gorman over for a "left-lane violation," which he defined as a "slow-moving vehicle in the left lane" with traffic backing up behind it.  Monroe Depo. at 46:3-9.  Monroe was unable to identify the specific statute, but stated that "[w]hen you have traffic in the left lane that is impeding the flow of traffic, that's where it becomes a violation."  *Id.* at 49:2-9.  Nev. Rev. Stat. ("NRS") 484B.627 provides that if a driver "drives a motor vehicle at a speed so slow as to impede the forward movement of traffic proceeding immediately behind the driver," he or she must "drive to the extreme right side of the highway." Fisher articulated two separate observed traffic violations to justify his investigatory traffic stop: (1) he "noticed the vehicle drift to the right and drive on the white fog line," and (2) he "further noticed the driver had the curtain pulled forward on the driver's side window which obstructs the driver's view of the vehicle's left blind area[,]" both in violation of Nevada law.[6]  Doc. #18, Ex. A, 4:12-17.

As discussed below, the Court believes that the two traffic stops are inextricably connected and that Gorman's total detention was unreasonably prolonged.  However, the Court finds under *Heien* that both stops were supported by reasonable suspicion based on the officers' belief that they observed traffic violations.  These determinations were not objectively unreasonable.[7]

### B.    Prolonged Detention

Gorman also challenges the legality of his "prolonged detention," which he claims exceeded the scope and duration of the purported justification for the initial investigatory traffic stop.

---

[6] NRS 484B.223(1) states that drivers must drive "as nearly as practicable entirely within a single lane." NRS 484B.163(3) provides that "a vehicle must not be operated upon any highway unless the driver's vision through any required glass equipment is normal."

[7] Fisher's belief that a fog line violation occurred was likely mistaken.  In *United States v. Lopez-Rojo*, this Court found that "[a]lthough the Nevada Supreme Court—or any other Nevada court—has not issued an opinion regarding what constitutes a failure to maintain a traffic lane, persuasive authority weighs in favor of finding that crossing over, *as opposed to touching*, a fog line constitutes [a violation of NRS 484B.223(1)]." No. 3:07-cr-0080, 2008 WL 2277495, at *5 (D. Nev. May 29, 2008) (emphasis added).  In *United States v. Delgado-Hernandez*, the Ninth Circuit concluded that the defendant did not violate NRS 484B.223(1) by briefly crossing over the fog line approximately twelve to fourteen inches one time.  283 Fed. Appx. 493, 496-99 (9th Cir. 2008).  The Ninth Circuit found significant the fact that the defendant was not speeding or otherwise driving in an erratic manner.  *Id.* at 497-98.

Assuming that the investigative stops were justified at their inceptions, the duration of the stops must be assessed for reasonableness. Gorman asserts that there was no continuing justification for the delay in conducting the canine sniff because Fisher had already completed his investigation regarding the suspected traffic violation, and Monroe had already conducted a records check. The United States contends that the canine sniff did not delay the investigative traffic stop any longer than was necessary because the records check was still in progress at the time of the canine sniff.[8] Doc. #25, 28:17-19. Fisher testified that the records check was still in progress at the time he performed an exterior canine sniff of the motor home. Fisher Decl. ¶7; Doc. #23 ("Second Fisher Decl."), 4:20-22.

In *Rodriguez v. United States*, the Supreme Court considered an officer's prolongation of a traffic stop in order to conduct a canine sniff. *Rodriguez*, 135 S. Ct. at 1612. The traffic stop in *Rodriguez* occurred after officer Struble observed a vehicle veer onto the shoulder of Nebraska State Highway 275 and then jerk back onto the road. *Id.* Struble is a K-9 officer, and his canine "Floyd" was on patrol with him that night. *Id.* Struble effectuated a traffic stop and asked the driver, Rodriguez ("Rodriguez"), why he was driving erratically, to which Rodriguez replied that he had swerved to avoid a pothole. *Id.* at 1613. Struble ran a records check on Rodriguez, and a second records check on Rodriguez's passenger. *Id.* Struble then called for a second officer to join him at the scene and began writing Rodriguez a warning ticket for driving on the shoulder of the road. *Id.* After issuing the warning, Struble asked for permission to walk his canine around Rodriguez's vehicle. *Id.* Rodriguez did not consent. *Id.* Struble then instructed Rodriguez to exit the vehicle and stand in front of the patrol car to wait for the second officer, who was in route. *Id.* When the officer arrived, twenty-seven minutes after Struble first effectuated the stop, Struble walked Floyd twice around Rodriguez's vehicle. *Id.* Floyd alerted to the presence of contraband halfway through the second pass around the vehicle. *Id.* A subsequent search revealed a large bag

---

[8] It is well established that a records check is an expected part of a traffic stop. *See United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007); *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

1   of methamphetamine.  *Id.*  Between seven and eight minutes passed between the time Struble

2   issued the warning and Floyd's positive alert to contraband.  *Id.*

3        The Court held that "[l]ike a *Terry* stop, the tolerable duration of police inquiries in the

4   traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that

5   warranted the stop, and attend to related safety concerns."  *Id.* at 1614 (internal citation omitted).

6   "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably

7   should have been—completed."  *Id.*  Ultimately, while an officer "may conduct certain unrelated

8   checks during an otherwise lawful traffic stop. . . . he may not do so in a way that prolongs the stop,

9   absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.* at

10  1615.  The Court noted that an officer's mission ordinarily includes "checking the driver's license,

11  determining whether there are outstanding warrants against the driver, and inspecting the

12  automobile's registration and proof of insurance."  *Id.*  A dog sniff, which is aimed at "detect[ing]

13  evidence of ordinary criminal wrongdoing," is not an ordinary element of a traffic stop.  *Id.*

14  (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).

15       Applying *Rodriguez*, the Ninth Circuit held recently that an officer's "prolongation of the

16  traffic stop to conduct both an ex-felon registration check and a 'dog sniff' violated the Fourth

17  Amendment unless the officer had independent reasonable suspicion to support the prolongations."

18  *Evans*, 2015 WL 2385010, at *1.  A traffic stop is not unreasonably prolonged if the officers

19  "diligently pursued" their investigation in order to "confirm or dispel their suspicions quickly."

20  *Sharpe*, 470 U.S. at 686.  The court must examine the "totality of the circumstances" surrounding

21  the stop to determine whether the length was reasonable.  *See Turvin*, 517 F.3d at 1101.  Following

22  *Rodriguez*, the central questions before the Court are whether the officers diligently pursued their

23  investigation, and whether they had independent reasonable suspicion to justify any prolongation of

24  Gorman's seizure.[9]

25  _____

26       [9] The Court also considers the Nevada Supreme Court's ruling on the constitutionality of a similar stop
to be persuasive.  In *State v. Beckman*, the Nevada Supreme Court held that "[a] prolonged stop may be

### 1.   The Prolonged Stop Was Not Consensual

As an initial matter, the Court notes that the extensions of Gorman's stops were not consensual.  This is important because both *Rodriguez* and *Evans* involved searches that occurred after the driver refused to consent to a dog sniff.  *Rodriguez*, 135 S. Ct. at 1613; *Evans*, 2015 WL 2385010, at *3.  Here, Gorman expressed frustration more than once about having been stopped so soon after the initial stop, and about Fisher asking the same questions that Monroe had asked only forty minutes earlier.  Gorman also stated that he had "opposition" to Fisher's canine sniff.

The Court is particularly troubled that the officers' belief that Gorman would not consent to a search, and his opposition to the canine sniff, appears to have contributed to the officers' purported reasonable suspicion to extend the stop and continue the investigation.  Individuals have a right to refuse consent for a search, and the existence of this right requires that denial of consent not be a basis to prolong a stop.  *See Graves v. City of Coeur D'Alene*, 339 F.3d 828, 841 (9th Cir. 2003), *abrogation on other grounds recognized by C.B. v. City of Sonora*, 769 F.3d 1005 (9th Cir. 2014) (finding that refusal "to consent to a search cannot be a basis for the arrest unless [the officer] had a right to search" independent of the refusal); *Gasho v. United States*, 39 F.3d 1420, 1439 (9th Cir. 1994) (noting that refusal to consent to a search "could not serve as a basis for finding criminal intent"); *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) (finding that refusing to consent to a search cannot be a crime, "[n]or can it be evidence of a crime").  The record indicates that Gorman did not consent to the dog sniff, and his refusal to consent does not justify his prolonged seizure.

### 2.   The Investigation Was Unreasonably Prolonged

Gorman argues that his stops were unreasonably prolonged.  Specifically, Gorman notes that Fisher "embarked upon an investigation entirely unrelated to the purpose and proper scope of the traffic stop," including "repeated questions about his travel itinerary, the purpose of his road

---

reasonable in three limited circumstances: when the extension of the stop was consensual, the delay was de minimis, or the officer lawfully receives information during the traffic stop that creates a reasonable suspicion of criminal conduct."  305 P.3d 912, 917 (Nev. 2013) (en banc).

trip, his employment, and his future plans; and thereupon proceeding to instead prepare a consent-to-search form for the motorhome." Doc. #18 at 24. Courts have been reluctant to set a specific time limit for what would constitute unreasonable delay. *See Turvin*, 517 F.3d at 1102-03 (discussing unreasonable delay and declining to adopt a bright-line rule). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably* extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (emphasis added). Here, Gorman was initially stopped for a minor traffic offense at approximately 9:03 a.m. and released at approximately 9:26 a.m. when Monroe concluded that he did not have probable cause to search the motor home. Gorman was stopped the second time, again for a minor traffic offense, at approximately 10:15 a.m., Doc. #23 at 10, and held for more than nine minutes before Fisher asked if he could conduct a canine sniff. Fisher knew that Monroe had previously ran a records check and lacked probable cause to hold Gorman, but nonetheless two additional records checks were conducted in order to prolong the detention and make time for a canine sniff. The positive alert occurred approximately twelve minutes after the second traffic stop occurred.

All tolled, Gorman was detained for a total of approximately thirty-five minutes without convincing independent reasonable suspicion—before the officers conducted a canine sniff of the motor home and obtained probable cause for the search. Of course, "an individual who has already been seized can still be *further* seized for purposes of the Fourth Amendment." *Hopkins v. Bonvicino*, 573 F.3d 752, 772 n.12 (9th Cir. 2009). But a second stop requires additional reasonable suspicion independent of the reasonable suspicion present in the first stop. *Evans*, 2015 WL 2385010, at *1; *see United States v. Ruelas-Lopez*, 220 Fed. Appx. 707, 708 (9th Cir. 2007) (noting that the defendant was correct that the second stop "must be supported by 'reasonable suspicion' independent of any suspicion that was dispelled as a result of the first stop"). As discussed below, such additional reasonable suspicion was not present here.

///

15

1    The Court must analyze a prolonged stop for reasonableness.  Based on the totality of the

2  circumstances, the Court finds that the officers' prolonged investigation was unreasonable because

3  it involved more than thirty-five minutes of detention before the canine sniff, all without sufficient

4  independent reasonable suspicion to prolong Gorman's seizure beyond the reasonable amount of

5  time necessary to complete the purpose of the traffic stops.  Importantly, the Supreme Court held in

6  *Rodriguez* that an ordinary traffic stop includes "checking the driver's license, determining whether

7  there are outstanding warrants against the driver, and inspecting the automobile's registration and

8  proof of insurance."  135 S. Ct. at 1615.  Fisher was aware that Monroe had already conducted

9  these checks, but conducted additional redundant checks in order to prolong the stop to allow for a

10  canine sniff, all without additional reasonable suspicion.  The Court finds under *Rodriguez* that this

11  prolongation was unreasonable.

12        **3.   The Prolongation of the Second Stop Was Not Supported by Independent
              Reasonable Suspicion**

13

14        Finally, Gorman argues that nothing in Gorman's interaction with Monroe or Fisher gave

15  Fisher reasonable suspicion to prolong the traffic stop.  Fisher knew that Monroe had already

16  stopped Gorman, conducted a records check, and concluded that he lacked probable cause to search

17  the motor home.[10]  Doc. #18 at 25.  Gorman argues that Fisher's articulated reasons for expanding

18  the investigation following the records checks were not supported by any additional reasonable

19  suspicion.  Specifically, Fisher stated that his EPIC check indicated that Gorman "had multiple

20  border crossings with the most recent in 2012 from Madrid, Spain, into the United States" and that

21  Gorman "transferred $11,000 cash to another subject with an unknown name."  *Id.*, Ex. A at 5.

22  Gorman states that "these are entirely innocuous circumstances common to untold numbers of law

23  abiding citizens."  *Id.* at 26.  Fisher also referred to Gorman's refusal to answer questions and

24

25        [10] Of course, just because an officer concluded "that he did not have enough evidence to seek a federal
     search warrant does not establish that probable cause was lacking."  *United States v. Crawford*, 657 F.2d 1041,
26  1047 (9th Cir. 1981).  Here, the Court considers Monroe's determination that he lacked probable cause for a
     search in the context of Gorman's argument that his traffic stops were unreasonably prolonged, not to conclude
     that probable cause for the ultimate search was lacking.

"abrupt initial contact" in support of his probable cause explanation.  *Id.*, Ex. A at 5.

Fisher's purported additional reasonable suspicion falls short.  Fisher referred frequently to Gorman's abrasive demeanor, and stated that this seemed suspicious.  Courts often rely on conclusions of police officers because their experiences enable them to notice factors that "might well elude an untrained person."  *United States v. Cortez*, 449 U.S. 411, 418 (1981).  Citing federal law, the Nevada Supreme Court has held that personality factors "such as nervousness are part of a reasonable suspicion analysis but, standing alone, carry little weight because many citizens become nervous during a traffic stop, even when they have nothing to hide."  *Beckman*, 305 P.3d at 918 (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002)).  Similarly, it is not surprising that an individual traveling through a remote stretch of an interstate highway would be frustrated about being pulled over twice and detained for minor traffic infractions in a fifty mile stretch of highway. In the context of Fisher's knowledge at the time of the stop—he knew that Monroe stopped Gorman less than an hour before—there was little about Gorman's reaction to support a reasonable suspicion to detain him further.[11]  Accordingly, Fisher did not have sufficient reasonable suspicion to prolong the second stop in order to conduct the canine sniff.

In its supplemental briefing, and after it became evident that the two stops were connected, the United States argues that "Monroe's earlier traffic stop is wholly irrelevant to the Fourth Amendment analysis applicable to Gorman's motion to suppress."  Doc. #62 at 16.  Specifically, the United States contends that "Fisher's traffic stop was based on his own observations of traffic violations being committed by Gorman, without regard to any information provided" by Monroe.

---

[11] Although not mentioned in the warrant application, Fisher stated at the evidentiary hearing that he also found it suspicious that Gorman met him at the door of the motor home with his identification and insurance information, and that he was wearing a winter jacket, hat, and gloves.  Considering that Gorman had been so recently pulled over, it was mid-January in northern Nevada, the temperature was below thirty degrees, and Fisher knew of the previous outdoor detention of Gorman, the Court finds that this conduct was not objectively suspicious.  Fisher also stated at the evidentiary hearing that Gorman's use of a motor home was suspicious because he doesn't see many motor homes on I-80 in the winter.  As there are many innocent reasons why the traveling public might drive a motor home on an interstate highway in January, Gorman's vehicle type, by itself, does not establish reasonable suspicion to prolong the stop. Moreover, it is the sheerest of speculation to assume a late model motor home over any other type of vehicle creates suspicion of criminal conduct.

1    *Id.* These statements cannot be reconciled with the testimony by Monroe and Fisher, or an

2    independent review of the evidence before the Court.  Fisher testified that Monroe told him that the

3    white motor home was driving in his direction with a Delaware license plate, that he suspected that

4    the motor home was carrying large amounts of currency, and that a canine sniff would likely be

5    needed to obtain probable cause for a search.  Fisher also testified that it is highly unusual for a

6    motor home to be driving cross-country through this portion of I-80 in January, which indicates that

7    he could quickly identify the vehicle to which Monroe referred.  Considering the entirely of this

8    history, and the fact that it was virtually certain that Gorman would drive past Fisher's location, the

9    two stops are closely related.

10        The Tenth Circuit Court of Appeals has held that information gleaned from one stop cannot

11   constitute the sole basis for reasonable suspicion to justify a second stop.  In *United States v.*

12   *Peters*, a case remarkably similar to this case, an officer pulled over a vehicle that had been

13   weaving between lanes of traffic.  10 F.3d 1517, 1519 (10th Cir. 1993).  Due to the nervous

14   demeanor of the vehicle's occupants, the officer concluded that they were likely transporting illegal

15   drugs.  *Id.*  The officer requested a canine unit but none was available.  *Id.*  After obtaining consent,

16   the officer conducted a search of the vehicle but did not discover evidence of drugs or other illegal

17   activity.  *Id.*  Still, the officer was not satisfied with the effectiveness of his search and continued to

18   suspect that the vehicle contained illegal contraband.  *Id.*  After releasing the suspects, the officer

19   reported the stop to his superior, who relayed the information to the local DEA office.  *Id.*  The

20   DEA then passed information about the stop to a border patrol agent with a description of the truck

21   and its occupants, and a full description of the prior stop.  *Id.* at 1520.  The second officer then

22   stopped the vehicle, and while questioning the occupants, noticed evidence of a counterfeit social

23   security card, which led to the driver's confession that he was in the country illegally.  *Id.*  No drugs

24   were discovered.  *Id.*  The court concluded that the second stop was unconstitutional because an

25   officer who conducts a search cannot wait until the suspect "has traveled down the road a few

26   miles, and then make a second *Terry* stop based solely on the conduct that has already proved to be

18

illusory." *Id.* at 1522.  It follows that an officer who conducts a stop and concludes that reasonable suspicion is not present for a search "cannot circumvent *Terry* and *Place* by calling upon a different officer to make the second intrusion in his stead." *Id.*

The Court agrees with this analysis,[12] and finds that based on the present facts, the second stop was not based on independent reasonable suspicion sufficient to justify the prolonged investigation.  No matter how this can be viewed, the two stops were for minor traffic violations and they both were extended beyond the legitimate purposes for such traffic stops.

Importantly here, the evidence indicates that Fisher never would have pulled Gorman over if Monroe had not relayed information about the first stop, a description of the white motor home, Monroe's suspicion that the vehicle contained large amounts of currency, and that a canine sniff would likely be required in order to obtain probable cause for a search.  After speaking with Monroe, Fisher positioned his vehicle between the 302 and 303 mile markers on I-80 and waited until he saw the motor home, at which point Fisher began to follow the vehicle and thereafter effectuated the traffic stop.  Fisher, a sergeant and canine handler, was normally assigned to felony investigations, and his duties normally did not involve traffic patrol.  The second detention was therefore a foregone conclusion based on the information passed to Fisher by Monroe, rather than an investigation based on Fisher's independent determination that reasonable suspicion existed to conduct the second stop based upon a suspected traffic violation.

The Court finds based on the foregoing that the officers' prolonged investigation was not consensual, reasonable, or conducted with independent reasonable suspicion.  Accordingly, the second traffic stop was unreasonably prolonged under the Fourth Amendment.  *Rodriguez*, 135 S.

---

[12] Gorman also argues that the second stop was unconstitutional under *United States v. Johns*, 891 F.2d 243, 245-46 (9th Cir. 1989). Doc. #61 at 35.  In *Johns*, the Ninth Circuit suppressed evidence because an initial illegal traffic stop "was the impetus for the chain of events leading to the marijuana and thus [was] too closely and inextricably linked to the discovery for the taint to have dissipated." *Johns*, 891 F.2d at 245-46.  *Johns* is distinguishable because it involved an initial stop that was wholly illegal.  Here, the Court has found that under *Heien*, Monroe's stated belief that he had reasonable suspicion to conduct the initial traffic stop was not objectively unreasonable.  However, it appears that the first traffic stop was also unduly prolonged under *Rodriguez*.

Ct. 1615; *Evans*, 2015 WL 2385010 at *1.  Based on this Fourth Amendment violation, the Court

grants Gorman's Motion to Suppress.

### C.      Search of the Motor Home

Before the officers received a response from dispatch on the records search, Fisher asked

Gorman if he had an objection to Fisher conducting a canine sniff around the motor home.  Gorman

responded "I have opposition, if that means anything."  Fisher then conducted a weapons pat-down

search of Gorman, and asked him to stand twenty to thirty feet in front of the motor home.  Next,

Fisher released Euros from his vehicle and began the canine sniff.  After circling the motor home,

Euros sat down near the back right compartment of the vehicle.  Fisher described this as a

"committed sit and stare," which he considered to be a positive alert.  Gorman expressed disbelief

that the dog would positively alert to the back right compartment, and then stated that the officer

could search the compartment, noting that it had never contained drugs.  Fisher declined and

returned to his vehicle to request a search warrant, which an Elko County Justice of the Peace

granted at approximately 11:15 a.m.  Thereafter, the officers searched the entire motor home, rather

than searching only the back rear compartment where Euros positively alerted, and found the

defendant currency throughout the motor home.

Gorman argues that the search warrant was tantamount to a "general warrant" because it did

not state the object of the search with particularity, instead referring to "any evidence of a crime at

this time unknown which may come into view of the searching officers, including but not limited to

any instrumentalities or objects consistent with controlled substance violations."  Doc. #18, Ex. C.

The Fourth Amendment addresses the problem of general warrants—implicating an "exploratory

rummaging in a person's belongings"—"by requiring a 'particular description' of the things to be

seized."  *Andresen v. Maryland*, 427 U.S. 463, 479 (1976) (quoting *Coolidge v. New Hampshire*,

403 U.S. 443, 467 (1971)).  In *Andresen*, the Court upheld a warrant authorizing a search of "other

fruits, instrumentalities and evidence of a crime at this [time] unknown" only because it concluded

with "a sentence containing a lengthy list of specified and particular items to be seized."  *Id.*  The

1  Court finds that *Andresen* would also uphold the present warrant, which identifies "controlled

2  substances, paraphernalia, articles of personal property tending to identify the person or persons in

3  control of the vehicle to be searched, and/or any contraband, fruits, instrumentalities" before

4  mentioning "any evidence of a crime at this time unknown which may come into view of the

5  searching officers." *See* Doc. #18, Ex. C.

6  However, even assuming that the officers had probable cause to search the back right

7  compartment where the canine alerted, the Court is not convinced that the dog's positive alert to the

8  compartment gave the officers probable cause to search the *entire* motor home.  Despite Gorman's

9  consent to search the compartment, the officers did not even begin their search of the motor home

10  with the compartment, instead beginning with a search of the motor home's main cabin.  "Probable

11  cause to believe that a container placed in the trunk of a taxi contains contraband or evidence does

12  not justify a search of the entire cab." *United States v. Ross*, 456 U.S. 798, 824 (1982); *California

13  v. Acevedo*, 500 U.S. 565, 580 (1991).  *Ross* also states that if "probable cause justifies the search

14  of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that

15  may conceal the object of the search."  456 U.S. at 825.  Of course, this language only applies if the

16  officers had probable cause to search the entire vehicle in the first place.  Here, the purported

17  positive canine alert supported probable cause for the back right compartment of the vehicle, but

18  not the entire vehicle, because Euros walked around the motor home and only alerted to the back

19  right compartment.  *Cf. United States v. Stewart*, 770 F.2d 825, 829 (9th Cir. 1985) (noting that

20  *Ross* stands for the proposition that "if probable cause exists to search an entire vehicle, rather than

21  merely a particular container in the vehicle, the search may extend to the entire vehicle").

22  The parties have not briefed this issue, and the Court need not weigh in considering that the

23  Court has held that the officers unreasonably prolonged their investigation prior to the canine sniff

24  without the existence of additional reasonable suspicion.

25  ///

26  ///

**D.    Omissions by the Government**

**1.    Omissions in Fisher's Warrant Application**

Fisher's original telephonic warrant application (Doc. #18, Ex. A), first declaration submitted to the Court (Doc. #12), and second declaration submitted to the Court (Doc. #23) each contain significant material omissions regarding Gorman's seizure and search. First, the warrant application never mentions Monroe's original stop, that Monroe called Fisher with information about Gorman and Gorman's vehicle, or that Fisher was dispatched to investigate Gorman. *See generally* Doc. #18, Ex. A. This omission thereby represented to the magistrate that Fisher pulled Gorman over solely due to his traffic violations, as opposed to having been encouraged to investigate Gorman by NHP and Monroe. Second, Fisher represents in the warrant application that Gorman "indicated he had no job." *Id.* at 5. This is unambiguously contradicted by the video of Fisher's questioning of Gorman, in which Gorman states clearly that he works for a Maui paddle board company.

"To prevail on a claim that the police procured a warrant through deception, the party challenging the warrant must show that the affiant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *United States v. Ruiz*, 759 F.3d 1144, 1148 (9th Cir. 2014). "If the officer omitted facts required to prevent technically true statements in the affidavit from being misleading, the court determines whether the affidavit, once corrected and supplemented, establishes probable cause." *Id.* (quoting *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009)). "If probable cause remains after amendment, then no constitutional error has occurred." *Id.* (quoting *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1084 (9th Cir. 2011)). In *Ruiz*, the Ninth Circuit considered a warrant that was granted after the officer omitted evidence regarding witnesses' prior crimes and evidence of dishonesty, where the witnesses' statements helped establish probable cause for the search. *Id.* at 1147. The court held that these were serious material omissions, but that even without the information, there was "enough evidence in the record corroborating [the witnesses'] statements to 'diminish[] the adverse

22

1   effect' of their credibility issues in the context of the probable cause inquiry." *Id.* at 1152 (quoting

2   *United States v. Reeves*, 210 F.3d 1041, 1045 (9th Cir. 2000)).

3          Fisher stated in the warrant application that he decided to effectuate a traffic stop after he

4   "noticed the vehicle drift to the right and drive on the white fog line.  I further noticed the driver

5   had the curtain pulled forward on the driver's side window which obstructs the driver's view of the

6   vehicle's left blind area."  Doc. #18, Ex. A at 4.  Ultimately, Fisher stated that he believed probable

7   cause existed to search Gorman's vehicle because "Euros alerted to the right rear fender and cargo

8   department by displaying changes in breathing, rapid sniffs, along with a committed sit and stare

9   response, with a final committed down and final stay response, which indicated to Deputy Fisher

10  that there may be controlled substances . . . inside the vehicle."  *Id.* at 6.

11         The Supreme Court has granted wide deference to positive alerts of canine units to justify

12  probable cause to conduct a search of a vehicle.  *See Illinois v. Caballes*, 543 U.S. 405, 409 (2005)

13  (finding that a dog sniff supported a finding of probable cause for a search, and that "the use of a

14  well-trained narcotics-detection dog . . . during a lawful traffic stop[] generally does not implicate

15  legitimate privacy interests"); *United States v. Place*, 462 U.S. 696, 707 (1983) (noting that a

16  canine sniff "does not expose noncontraband items that otherwise would remain hidden from

17  public view").  Accordingly, Fisher's warrant application likely included sufficient information to

18  support a finding of probable cause based on Euros' positive alert alone, and the omitted

19  information, if added to the warrant affidavit, likely would not negate the finding of probable cause.

20         The parties have not briefed this issue, and the Court need not determine whether Fisher's

21  omissions in the warrant application—that could have led the magistrate to believe that the second

22  stop rendered the officers' investigation of Gorman unconstitutionally long—require suppression of

23  the seized evidence because the Court has already held that the evidence must be suppressed based

24  on the officers' collective unreasonably prolonged successive traffic stops.  Accordingly, the Court

25  declines to rule on the validity of the search warrant based upon the errors and omissions in the

26  search warrant application, and documents filed with the Court.

**2.  Omissions by the United States Attorney—Half of the Story**

The Court is disappointed that the United States would aggressively pursue this forfeiture action while all of its moving documents for summary judgment and supporting affidavits contained material omissions concerning the history leading to the traffic stop and canine sniff at issue.  The government's Motion for Summary Judgment, with supporting affidavits from Deputy Fisher and the Assistant United States' Attorney, made no disclosure of anything which would have suggested that Fisher's stop was a follow-up on Monroe's stop and was based upon suspicion of a drug related offense. The government's Motion for Summary Judgment and supporting affidavits did not disclose the existence of any of the following:

(a)  that there was a stop by Monroe;

(b)  that Monroe called the Elko County Sheriff's office even before he had released the suspect Gorman and his motor home;

(c)  that Monroe was suggesting that a canine sniff be conducted on Gorman's motor home even though he recognized that probable cause at that point was lacking for a search;

(d)  that the reason Fisher was involved was because he was a canine officer;

(e)  that Fisher was a sergeant involved in felony investigations and was not normally a traffic officer;

(f)  that there was a cell phone conversation between Monroe and Fisher wherein the officers discussed Monroe's stop and the oncoming arrival in the Elko area of Gorman and the motorhome[13] and this included:

(1)  identification of Gorman, the motor home and its license plate;

(2)  that Monroe suspected that the motor home was carrying large amounts of currency related to drug activity; and

(3)  that a canine sniff would be necessary to establish probable cause for a search;

///

---

[13]  Gorman was traveling on Interstate Highway 80 between Wells, Nevada, and Elko, Nevada, an isolated area of northern Nevada. This is an approximate 50 mile stretch of interstate highway with limited off ramps. The first populated area Gorman would be passing through after Monroe's stop would be Elko, and this would be shortly after Fisher and Monroe's conversation.

(g) that the purpose of Fisher and his canine positioning themselves between the 302 and 303 mile markers on I-80 was to wait for Gorman to pass by in the motor home; and

(h) that upon seeing the motor home and following it, Fisher's purpose was to find a traffic violation which might support pulling over Gorman and thereafter initiating a canine sniff of the motor home.

None of this history was disclosed in the government's Motion for Summary Judgment or in it's reply in support of its Motion. The simple fact is that the two stops are inextricably linked. Notwithstanding this, the government's entire Motion for Summary Judgment presented to the court was framed in the context expressed on page three of the Motion:

> ***Given the state of the evidence, summary judgment should now be entered in favor of the United States because the aggregate facts – taken as a whole – satisfy the United States' burden of proof in this case and those facts cannot be rebutted by Gorman.

II.  STATEMENT OF FACTS[1]

1.   On January 23, 2013, **ECSO Deputy Doug Fisher was monitoring west-bound traffic on Interstate 80 near Elko, Nevada.** At approximately 10:20 am, he observed a white motorhome bearing Delaware license plates traveling westbound with the driver's side window obstructed by a window curtain which had been pulled forward. Deputy Fisher followed the white motorhome and observed the motorhome drift to the right on to the white fog line three times and remain on the fog line each time for a least 400 yards. Deputy Fisher also observed that the rear window of the motorhome was obstructed by blinds or curtains which were closed. See Fisher Decl., ¶3.

FN 1: The Statement of Facts is supported by the declaration of ECSO Deputy Doug Fisher (#12), filed herewith and the Declaration of Greg Addington (#13). Gorman's discovery responses are attached as exhibits to the Addington declaration.

*See* United States' Motion for Summary Judgment, Doc. #11 at 3:12-24 (emphasis added).

The government's nondisclosure of the information regarding Monroe's initial stop is troublesome for many reasons, but certainly because the relationship between the two stops is so obviously relevant to the legal issues before the Court.  *See United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 953 (9th Cir. 2009) (granting claimant's motion for summary judgment because the information supporting probable cause to institute the civil forfeiture action was directly linked to an illegal search).  In *$186,416.00*, the Ninth Circuit emphasized that the dual

25

purposes of the exclusionary rule are "to deter police misconduct in the future and to preserve the integrity of the courts," and that "the exclusionary rule is particularly well-suited to advance both of these goals in the context of civil forfeiture proceedings." *Id.* at 950.  Applying these principles, the Ninth Circuit found that a search of a medical marijuana clinic was illegal because when applying for a search warrant, the Los Angeles Police Department "was aware of extensive evidence to suggest" that the clinic was operating legally under California law but nevertheless "omitted any reference to this evidence when applying to a state magistrate for a search warrant under *state* law." *Id.* at 952 (emphasis in original).  The Court ruled in favor of the claimant because there was an "unbroken 'causal chain' link[age]" between what was not disclosed and what was.

As in *186,416.00*, Monroe's stop and communication with Fisher should have been disclosed to the Court because "there indisputably is a strong connection between" Monroe's stop and the forfeiture of Defendant currency. *Id.* at 951.  Rather, the United States' Motion for Summary Judgment omitted the entirety of the reasons why Deputy Fisher was monitoring the westbound traffic on I-80, why his canine was with him, and why the stop was drug oriented rather than a routine traffic stop.  The Ninth Circuit has expressly approved of application of the exclusionary rule when currency was seized as a result of such government omissions, noting that the civil forfeiture context is "particularly well-suited" to advancing the exclusionary rule's goals: to deter misconduct in the future and preserve the integrity of the courts.  *Id.* at 950.

In particular, the government has a duty of candor and fair disclosure to the Court.[14]  The Court expects and relies upon the United States Attorney's Office to be candid and forthcoming with material information uniquely held only in possession of the government and clearly relevant to central issues before the Court.  That did not occur here.

---

[14] This district has recently emphasized the importance of candor to the Court at all stages of investigation. *See United States v. Wei Seng Phua*, No. 2:14-cr-0249, 2015 WL 1757489, at *12 (D. Nev. Apr. 17, 2015) (suppressing evidence obtained as a result of an unconstitutional ruse to obtain consent for a search, and material omissions in the warrant application).

**E.     Attorney Fees**

The Civil Forfeiture Reform Act ("CAFRA") provides that a successful claimant in a civil forfeiture action can recover from the United States "reasonable attorney fees and other litigation costs reasonably incurred by the claimant."  28 U.S.C. § 2465(b)(1)(A).  Applying this provision of CAFRA, the Ninth Circuit has held that "attorney fees awarded under CAFRA are payable to the claimant, not to claimant's attorney."  *United States v. $186,416.00 in U.S. Currency*, 642 F.3d 753, 754-55 (9th Cir. 2011).

Gorman is undoubtedly the successful party here.  If Gorman elects to file a Motion for Attorney Fees, the Court will entertain such a motion filed within fourteen (14) days of this Order.  Gorman shall comply with Local Rule 54-16 in filing such a motion.  The United States shall file any response within two weeks of Gorman's motion.  Gorman may file a reply within one week of the United States' response.

**IV.    Conclusion**

IT IS THEREFORE ORDERED that Gorman's Motion to Suppress (Doc. #18) is GRANTED.  The seized funds shall be returned to Gorman, or his designee, within thirty (30) days of the entry of this order.

IT IS FURTHER ORDERED that Gorman's Motion for Leave to File Excess Pages (Doc. #60) is GRANTED.

IT IS SO ORDERED.

DATED this 12th day of June, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE