1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                                DISTRICT OF NEVADA

8                                      * * *
                                        )
9    UNITED STATES OF AMERICA,          )
                                        )
10                      Plaintiff,      )          3:13-CV-00324-LRH-VPC
       v.                               )
11                                      )
     $167,070.00 IN UNITED STATES       )          ORDER
12   CURRENCY,                          )
                                        )
13                      Defendant.      )
     _____ )
14                                      )
     STRAUGHN SAMUEL GORMAN,            )
15                                      )
                        Claimant.       )
16   _____ )

17          Before the Court is Claimant Straughn Gorman's ("Gorman") Motion for Attorney Fees and

18   Costs.  Doc. #73.[1]  Plaintiff the United States of America ("United States") filed a Response (Doc.

19   #78), to which Gorman replied (Doc. #82).  Gorman also filed an Errata to his Motion, which

20   attached relevant portions of a document titled "Transactions Fees & Costs" that had inadvertently

21   been omitted from Gorman's original Motion.  Doc. #79.  The United States filed a Supplemental

22   Memorandum in response to this document[2] (Doc. #84), to which Gorman replied (Doc. #85).

23

24   _____

25          [1] Refers to the Court's docket number.

26          [2] The United States initially filed an Objection to Gorman's Errata.  Doc. #80.  The Court overruled
     this objection and granted the United States an opportunity to respond to the fees and costs listed in Gorman's
     Errata.  Doc. #83.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## I.      Facts and Procedural History

This civil forfeiture case arose from a January 23, 2013 traffic stop on Interstate 80 ("I-80") near Elko, Nevada at 9:03 am, that led to a search and subsequent seizure of $167,070.00 found in Gorman's motor home.[3]  Nevada State Trooper Greg Monroe ("Monroe") stopped Gorman for a "left-lane violation" because he was driving slowly in the left lane and traffic had backed up behind his motor home.  After asking Gorman questions both related and unrelated to the traffic stop, Monroe developed suspicion that Gorman's motor home contained contraband or currency related to drug trafficking.  Monroe requested a canine unit and called for a driver's license warrant check and a criminal history check.  Soon after, dispatch informed Monroe that no canine units were available, and Gorman's license check came back clean.  At this point, Monroe asked dispatch how far away a canine unit was and conducted an El Paso Intelligence Center ("EPIC") check for law enforcement activities involving drugs at Gorman's residence.  This check revealed a "DEA hit" on Gorman involving a transfer of $10,000 out of the country, but all other checks were negative.  At 9:23 am, twenty minutes after the stop began, Monroe informed Gorman that he was not going to write a ticket, handed him his identification, and said he was free to leave.  Immediately afterward, Monroe began asking additional questions, and eventually asked for consent to search the vehicle, which Gorman declined.  At this point, Monroe told Gorman that he was free to leave, and the first seizure ended.

Monroe then contacted Nevada Highway Patrol ("NHP") dispatch and informed the operator that there was a vehicle headed westbound on I-80 from Wells, Nevada, that he strongly suspected was carrying large amounts of currency.  Monroe informed the operator that the only way to get probable cause to search Gorman's motor home would be to use a canine unit.  NHP dispatch then informed Elko County Sheriff's Office Deputy Doug Fisher ("Fisher") that Monroe had stopped a vehicle near the 360 mile marker on I-80 and that Fisher might want to follow up with his

---

[3] For a more detailed description of the facts of this case, refer to the Court's Order granting Gorman's Motion to Suppress.  Doc. #72 at 2-8.

canine.  Monroe also called Fisher directly to relay his suspicions about Gorman and inform Fisher that Gorman was driving westbound on I-80 from Wells, Nevada, toward Elko.  After obtaining information about the first seizure from Monroe, Fisher began a roving highway patrol and became stationary between the 302 and 303 mile markers on I-80 near Elko, facing eastbound.[4]

At approximately 10:15 am, Fisher observed Gorman's motor home traveling westbound with the driver's side window obstructed by a curtain that had been pulled forward.  Fisher followed the motor home and observed it drift to the right onto the fog line three times and remain on the fog line each time for approximately 400 yards.  Based on these observed violations of Nevada traffic laws, Fisher effectuated a traffic stop.  Fisher asked questions both related and unrelated to the traffic stop and requested a records check.  The exact timing for the records check was contested.  The dispatch Call for Service Report indicated that another officer, Deputy Prall, requested a records check approximately six minutes into the stop.  Seven minutes into the stop, Prall requested an EPIC check, which revealed that Gorman had four border crossings, most recently between the United States and Spain.  While waiting for the results of the records check to return, Fisher attempted to ask more questions but Gorman indicated that he did not want to answer, noting that he had been pulled over shortly before, and answered many questions during the first seizure.  At this point, Fisher asked Gorman if he would object to a dog sniff around his motor home.  Gorman responded "I have objection, if that means anything."  Fisher then conducted a weapons pat-down of Gorman and asked him to stand twenty to thirty feet in front of the motor home.  Fisher's canine "Euros" then walked around the motor home and positively alerted to the scent of contraband near the back right compartment of the motor home.

Fisher obtained a warrant, and a subsequent search revealed Defendant currency and other evidence consistent with drug trafficking.  The United States filed its Complaint in Forfeiture In Rem on June 17, 2013 (Doc. #1), and a Motion for Summary Judgment on February 18, 2014 (Doc.

---

[4] The United States omitted information about the first stop and the communications between Monroe and Fisher in its Motion for Summary Judgment and supporting documents. *See* Doc. #11; Doc. #12.

#11).  Gorman filed a Motion to Suppress on April 11, 2014.  Doc. #18.  On July 27, 2014, the Court denied the United States' Motion for Summary Judgment, deferred ruling on Gorman's Motion to Suppress, and set an evidentiary hearing.  Doc. #28.  The Court held an evidentiary hearing on December 15 and 16, 2014, during which the Court heard deposition testimony of Monroe, live testimony of Fisher, and reviewed the video of each traffic stop.

On June 12, 2015, the Court granted Gorman's Motion to Suppress, finding that the second traffic stop was unreasonably prolonged without independent reasonable suspicion to justify the prolongation.  Doc. #72 at 19-20; *see Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (holding that while an officer "may conduct certain unrelated checks during an otherwise traffic stop. . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").  Finding that Gorman was undoubtedly the successful party, the Court added that it would consider a Motion for Attorney Fees filed under the Civil Asset Forfeiture Reform Act ("CAFRA"), 28 U.S.C. § 2465(b)(1)(A) and Local Rule 54-16.  The United States filed a Notice of Appeal on August 11, 2015.  Doc. #86.  Having reviewed the parties' briefing and all relevant evidence, the Court grants Gorman's Motion for Attorney Fees in the amount of $146,938.50 for those hours reasonably expended by Gorman's attorneys.

**II.    Legal Standard**

CAFRA provides that "in any civil proceeding to forfeit property . . . in which the claimant substantially prevails, the United States shall be responsible for . . . reasonable attorney fees and other litigation costs reasonably incurred by the claimant.  28 U.S.C. § 2465(b)(1)(A).  Courts apply the lodestar method to calculate reasonable attorney fees under CAFRA.  *United States v. $186,416.00 in U.S. Currency*, 652 F.3d 753, 755 (9th Cir. 2011).  "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate."  *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).  "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

The actual fee agreement between the claimant and his or her attorney can also be relevant to a court's determination of reasonable attorney fees. *$186,416.00 in U.S. Currency*, 652 F.3d at 755.

The number of hours for which the fee applicant is entitled to recover "may be reduced by the court where documentation of the hours is inadequate; if the case was overstaffed and hours are duplicated; if the hours expended are deemed excessive or otherwise unnecessary." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). "In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Id.* at 1210-11. An attorney "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n.12. District courts are empowered to reduce attorney fee awards if the "documentation of hours is inadequate," and courts are encouraged to exclude hours that were not "reasonably expended." *Id.* at 433; *Sorenson v. Mink*, 239 F.3d 1140, 1146 (9th Cir. 2001). When faced with unreasonable claimed fees, courts can apply a percentage reduction to reduce the proposed award to a more reasonable fee award. *Stewart v. Gates*, 987 F.2d 1450, 1452 (9th Cir. 1993).

**III.    Discussion**

Although the United States has filed a Notice of Appeal, the Court again acknowledges that Gorman has substantially prevailed; the Court granted his Motion to Suppress on June 12, 2015 (Doc. #72) and entered final judgment in his favor on July 7, 2015 (Doc. #75). Thus, the Court must now determine the amount of attorney fees to which Gorman is entitled. Gorman requests a total of $153,002.25 in attorney fees, which represents $148,317.00 in attorney fees accrued throughout this litigation[5] and an additional $4,685.25 for work expended preparing the motion for attorney fees. Three attorneys billed hours representing Gorman: (1) Michael Cristalli ("Cristalli"), a partner at Gentile Cristalli Miller Armeni & Savarese PLLC ("GCMAS"), billing at a rate of $510

---

[5] This figure includes $136,842.00 identified in the Transactions Fees and Costs attached with Gorman's errata (Doc. #79, Ex. 1 at 11) and $11,475.00 billed by Savarese in April and May 2015 as indicated by an invoice attached to Gorman's original Motion (Doc. #73, Ex. 1-B at 1).

per hour; (2) Vincent Savarese ("Savarese"), a partner at GCMAS and former senior counsel at Gordon Silver LLC ("Gordon Silver"), billing at $285 per hour, $330 per hour, $400 per hour, and $450 per hour at times throughout this litigation; (3) Dylan Ciciliano ("Ciciliano"), an associate attorney at Garman Turner Gordon, LLP and former associate at Gordon Silver, billing at $225 per hour. Doc. #73 at 5-6. Gorman represents that these hourly fees are commensurate with hourly fees charged by other attorneys with equal experience to Cristalli, Savarese, and Ciciliano. *Id.* Gorman adds that the majority of complicated Fourth Amendment analysis was conducted by Savarese, and more basic civil litigation tasks were handled by Ciciliano at his lower billing rate. *Id.* at 6. Gorman's Errata includes a detailed list of the fees billed by these three attorneys. Doc. #79, Ex. 1.

The United States does not challenge the hourly fees charged by Gorman's attorneys except to note that they should be viewed in light of the underlying fee agreement. Doc. #78 at 8.[6] However, the United States urges the Court to reduce Gorman's claimed attorney fees by a fixed percentage because Gorman's list of billed fees includes unrelated or vague entries. Doc. #84 at 4. Specifically, the United States challenges those charges related to conferences and correspondence with the Elko County District Attorney's Office as unrelated to this action. Additionally, the United States challenges certain entries for vagueness, including those labeled "LR forfeiture," "review case file status of forfeiture," "review discovery," "conference with client," "interrogatories," "prep MTS," "and other similarly vague entries throughout the billing records."[7]

///

---

[6] Gorman's Legal Representation Agreement indicates that Gorman made a $25,000.00 non-refundable minimum fee retainer, and that all hours expended once the retainer was exhausted would be billed at the attorneys' hourly rate. Doc. #82, Ex. A-1 at 1.

[7] In this Order, the Court primarily considers those fees specifically challenged by the United States. *See* D. Nev. LR 54-16(e) ("If an opposition is filed, it shall set forth the specific charges that are disputed and state with reasonable particularity the basis for such opposition."); *Nagy v. Grobstein*, No. 2:04-cv-1244, 2006 WL 2385383, at *2 (D. Nev. Aug. 17, 2006). However, the Court has conducted an analysis of Gorman's complete list of billed fees to determine if other entries not identified by the United States are improperly vague, as reflected in Part III.A of this Order.

*Id.* The Court addresses the United States' arguments regarding specific entries before turning to its request for an across-the-board percentage cut.

### A.    Specific Entries

The Court disagrees with the United States that the entries regarding communications with the district attorney's office should be excluded as irrelevant to Gorman's representation.  In addition to seizing Defendant currency, Elko County authorities seized Gorman's motor home and a number of his personal possessions.  Gorman argues that communications with the district attorney's office to retrieve this property were therefore directly related to this civil forfeiture action.  Additionally, Gorman's attorneys billed a total of four hours for communication with the district attorney's office, which is entirely reasonable given the inter-agency nature of this case.  Accordingly, the Court declines to strike those hours reasonably expended in communications with the district attorney's office from Gorman's proposed fee award.

The United States challenges two entries billed on April 8 and 9, 2014 titled "Prep MTS," which represent a total of 17.2 hours billed by Savarese.  Gorman's Motion to Suppress was filed soon after these entries, on April 11, 2014.  The Court finds that 17.2 hours is a reasonable amount of time for an attorney to spend on a motion to suppress regarding complicated Fourth Amendment issues.  The Court notes further that these hours are particularly reasonable given the quality of the motion, which was ultimately successful.  Additionally, "Prep MTS" provides sufficient information regarding the subject matter of those charged fees—preparing the motion to suppress.  *See Hensley*, 461 U.S. at 437 n.12 (holding that "at least counsel should identify the general subject matter of his time expenditures").  Accordingly, the Court declines to strike those hours reasonably expended preparing Gorman's Motion to Suppress.

The United States also challenges four entries from April and May, 2015, because Savarese billed these hours at a rate of $450 per hour, rather than the average rate of $334.50 identified in his Motion for Attorney Fees.  Doc. #78 at 9; *see* Doc. #73, Ex. 1-B at 1.  Gorman's Motion does not state that Savarese billed all of his hours at the hourly rate of $334.50, but rather that he billed at a

1  rate of $285 per hour in 2013, $330 per hour from January 1, 2014, to February 1, 2015, $400 per

2  hour beginning February 1, 2015, and $450 per hour beginning April 2015.  Doc. #73 at 6.  Gorman

3  noted that this led to an average lodestar of $334.50 but at no point stated that this rate would be

4  applied to all hours billed by Savarese throughout the litigation.  Accordingly, the Court declines to

5  reduce the 25.5 hours billed by Savarese at $450 per hour in April and May 2015.

6         The United States also argues that entries related to "meeting with client" or "conference

7  with client" are vague and should be excluded from any fee award.  Gorman is correct that the

8  attorney-client privilege precludes attorneys from including unredacted details of all conversations

9  with their client in fee logs.  *See* Fed. R. Evid. 502; *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500,

10  505 (9th Cir. 1986) (acknowledging that in a motion for attorney fees, a party may redact entries as

11  necessary to protect the attorney-client privilege).  However, the proper methodology is to include

12  the general subject of these meetings while billing but redact privileged information when

13  submitting the billing entries with the court so that the information remains privileged but the court

14  can conduct an in camera review if necessary.  *See MGIC Indem. Corp.*, 803 F.2d at 505 ("The

15  court may withhold from [an adverse party] any information it finds protected by the lawyer-client

16  privilege."); *Parker W. Int'l, LLC v. Clean Up Am., Inc.*, No. 08-2810, 2009 WL 2002950, at *1

17  (N.D. Cal. July 6, 2009) ("Billing records may be redacted for privilege, with the unredacted copies

18  to be submitted to the Court for in camera review.").  The list of Transactions Fees and Costs

19  includes two types of entries for meetings with client.  First, 6.8 hours are identified as meetings

20  with Gorman, the subject of which are at least partially redacted by black marks.  These entries are

21  proper because they indicate the event, redact the privileged material, but include enough

22  information for the Court to conduct an in camera review if necessary.  Second, another 9.2 hours

23  are identified merely as "meeting with client" or "conference with client," without any additional

24  information identified or redacted.  The Court finds that these entries are improperly vague because

25  no additional information exists upon which the Court could conduct an in camera review if

26  ///

necessary.  Accordingly, the Court will reduce the requested fee award by $3,945.75 for these vague entries.[8]

The United States also contests three entries for "LR forfeiture" (1.2 hours), "Review Discovery" (1.1 hours), and "Interrogatories" (1.5 hours).  The Court agrees that these entries are vague.  The "LR forfeiture" entry—for "legal research forfeiture"—does not identify any specific legal issue researched, or the purpose for which the research was conducted.  Similarly, the "Review Discovery" entry does not identify what type of discovery was reviewed, or whether the entry refers to the United States' or Gorman's discovery materials.  Similarly, the "Interrogatories" entry does not identify whether Cristalli was propounding interrogatories, responding to interrogatories, or reviewing interrogatories.  Although the Government did not so request, the Court also strikes a 0.8 hour September 15, 2014, entry labeled "Research" for vagueness.  Because these four entries are improperly vague, the Court will reduce the requested fee award by an additional $2,118.00 for those 3.8 hours billed by Cristalli, and 0.8 hours billed by Ciciliano.

### B.    Percentage Reduction

A district court can "make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application."  *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992) (internal quotation marks omitted).  Percentage reductions are "subject to heightened scrutiny," and do not relieve the court of its obligation to set forth a "concise but clear" explanation of its reasons for granting a particular fee award.  *Id.* at 1400.  Courts can impose an across-the-board percentage reduction for consistently vague billing entries, or impose a percentage reduction for a particular attorney's vague

---

[8]  This figure includes reductions based on split fees that identify both a vague subject and a non-vague subject.  For example, the figure includes half of a February 25, 2014, 4.10 hour fee entry labeled "Prep MTS; meeting with MVC, VS and client."  Doc. #79, Ex. 1 at 5.  As discussed above, "Prep MTS" is sufficient to provide the general subject matter of the charged entry.  Accordingly, the $3,945.75 reduction includes half of the $1,353.00 February 25, 2014, entry labeled "Prep MTS; meeting with MVC, VS and client."  The reduction also includes half of the fees charged by Savarese pursuant to split entries on March 25, 2013 ($370.50), August 27, 2014 ($528.00), October 7, 2014 ($1,023.00) and December 11, 2014 ($825.00), which all include vague entries regarding client meetings.

1  description of hours. *See, e.g.*, *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 50-51 (D.D.C.

2  2011) (declining to impose an across-the-board percentage reduction, but reducing one attorney's

3  billed fees by 25% due to "vague and inadequate descriptions contained in his timesheets").

4          Here, the Court finds that the majority of those hours billed by Gorman's attorneys were

5  reasonably expended, and that an across-the-board percentage reduction is not necessary.  The

6  Court acknowledges that this is a significant attorney fee award.  But the award is justified given

7  the complexity of the legal issues involved, the numerous motions filed by both parties—including

8  a motion for summary judgment and motion to suppress, time spent conducting discovery, the

9  quality of representation, and the results achieved.  The case also involved multiple evidentiary

10  hearings and supplemental briefing following the Supreme Court's *United States v. Rodriguez*

11  decision.

12          The Court notes that the United States' own actions may have increased the hours billed by

13  Gorman's attorneys.  In granting Gorman's Motion to Suppress, the Court expressed

14  disappointment that the United States aggressively pursued this forfeiture action while its Motion

15  for Summary Judgment and supporting affidavits contained material omissions concerning the first

16  traffic stop, by Monroe, and communications between Monroe and Fisher that led directly to the

17  second stop, by Fisher.  Doc. #72 at 24.  It is likely that disclosing information about this first stop

18  earlier in this litigation would have streamlined the issues before the Court and reduced the number

19  of hours reasonably expended by Gorman's attorneys to successfully claim Defendant currency.

20          Based on the foregoing, the Court finds that an across-the-board percentage reduction in

21  Gorman's requested attorney fees is not necessary here.  Again, this case involved complex legal

22  issues and multiple complicated motions which required court appearances and detailed pleadings.

23  Importantly, Gorman's attorneys were ultimately successful in litigating the issues before the Court.

24  Additionally, the Court has stricken in their entirety hours identified by the United States that the

25  Court agrees were improperly vague.  The Court declines to impose an additional across-the-board

26  percentage reduction.

**IV.     Conclusion**

IT IS THEREFORE ORDERED that Gorman's Motion for Attorney Fees and Costs (Doc. #73) is GRANTED.  The United States shall compensate Gorman for reasonable attorney fees in the amount of $146,938.50.

IT IS SO ORDERED.

DATED this 24th day of August, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE